WINDOM, Judge.
This Court’s opinion of February 25, 2011, is withdrawn, and the following opinion is substituted therefor.
Benito Ocampo Albarran appeals his capital-murder conviction and his sentence of death. Albarran was convicted of murder made capital because he shot and killed Officer Daniel Golden, a member of the Huntsville Police Department, while Officer Golden was on duty, see § 13A-5-40(a)(5), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Albarran be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Albarran to death.
The State’s evidence tended to show the following. On September 20, 2006, Officer Golden was dispatched to the El Jalisco restaurant on Jordan Lane in Huntsville to respond to an emergency 911 telephone call concerning a domestic disturbance between Albarran and his wife, Laura Cas-trejon. Castrejon told the 911 operator that Albarran had been drinking and was abusive. Albarran and his wife managed and cooked at the restaurant.
When Officer Golden arrived at the restaurant he got out of his patrol vehicle and approached the door of the restaurant. Albarran walked toward him pointing a .38 caliber Smith & Wesson brand revolver. Officer Golden put his arms in the air. Albarran fired at Officer Golden, and Golden returned fire with his 9 millimeter Beretta firearm until his gun misfired. One of Albarran’s shots hit Officer Golden in the lower abdomen, and he fell to the ground. As Officer Golden lay on the ground pleading for his life, Albarran approached him and fired another gun, a .38 caliber Rossi, at him. This bullet lodged in Golden’s protective vest. As Golden yelled: “Wait!” Albarran fired two more shots at Golden’s head.
Charles Ward, an employee of Warehouse Furniture, a business located next to the El Jalisco restaurant, testified that when he returned to the store’s office after making his deliveries, another employee, Chad Steele, yelled, “Oh, my God, a[n] officer’s just been shot.” (R. 2123.) Ward said that he went to the back door and opened it so that he could see what was happening. Ward stated that an officer was on the ground and a man behind a black truck picked up a black handgun, “discharged the magazine and pitched the gun.” (R. 2126.) The individual, whom he described as a “Latino gentleman” (R. 2126.), walked toward the ear dealership near the restaurant and spoke to an employee of the dealership. Ward said he telephoned emergency 911, and when he went back to the door to look out, he saw the Latino man smoking a cigarette.
Tanisha Thomas testified that she and her husband were driving past the El Jal- *146 isco restaurant when Officer Golden was shot. She said that she saw a police officer backing out of the restaurant and a man, whom she identified at trial as Albar-ran, in front of Officer Golden shooting at him. Thomas testified that the officer fell to the ground and yelled “Wait!” and that Albarran kept shooting at the officer. (R. 2029.)
William Thomas, Tanisha Thomas’s husband, testified: “I saw the police gun jam. Then the Mexican fired the shot and hit him and on impact he went down.” (R. 2086.) He further testified that after the officer went down, Albarran shot him and then walked up to the officer and shot him again.
Corporal Chris Carter of the Alabama State Troopers testified that he was driving down Jordan Lane on August 29, 2005, when he saw a police vehicle in a ditch. He pulled in behind the vehicle and observed an officer on the ground and two Huntsville police officers with their guns drawn in front of the El Jalisco restaurant. He pulled his weapon and walked to the back of the building. Cpl. Carter testified that a male from the car dealership next door said: “[That] is the guy that shot him,” and he pointed at Albarran. Cpl. Carter said that he and several other officers approached Albarran and repeatedly told him to get down and that he failed to respond to their commands, which were given both in English and in Spanish. Cpl. Carter testified that the officers could see both of Albarran’s hands so they walked toward Albarran, pulled him to the ground, and handcuffed him.
Dr. Emily Ward, the State Medical Examiner, testified that Golden died of multiple gunshot wounds. One of the bullets entered his head between his nose and left eye, a second bullet entered his left cheek and lodged in his brain, and a third bullet entered his lower abdomen.
Albarran did not dispute that he shot and killed Officer Golden. Albarran’s defense was that he was suffering from a substance-induced psychosis when the shooting occurred, that he was unable to appreciate the wrongfulness of his actions, and that his psychosis robbed him of the ability to form the specific intent to kill. Albarran presented the testimony of Dr. Jose Silva, a forensic psychiatrist. Dr. Silva testified that, in his opinion, at the time of the shooting Albarran was unable to appreciate the wrongfulness of his actions because of his cocaine- and alcohol-induced psychosis and that Albarran believed that his wife and Officer Golden had been sent by the “Devil” to harm him. (R. 3027.) Dr. Silva also said that Albarran was paranoid.
The State countered Dr. Silva’s testimony by presenting the testimony of Dr. James Hooper, Chief of Psychiatric Services at Taylor Hardin Secure Medical Facility. Dr. Hooper testified that, in his opinion, Albarran showed “no evidence of any abnormality — behavior interactions or anything else.” (R. 3252.) He testified that when Albarran was at Taylor Hardin, Albarran stated that “he was going to be found not guilty by reason of insanity.”
The jury convicted Albarran of capital murder for the intentional killing of Officer Golden. A separate sentencing hearing was held. During the sentencing hearing, Albarran presented the testimony of numerous individuals and family members from Albarran’s home town of Cacahuan-anshe, Mexico, who testified concerning Albarran’s difficult and impoverished life in Cacahuananshe. The jury recommended, by a vote of 10-2, that Albarran be sentenced to death. A sentencing hearing was held before the court pursuant to § 13A-5-47(c), Ala.Code 1975. Dr. Ricardo Weinstein, a forensic neuropsychologist, testified that he administered the Spanish *147 version of the Wechsler Adult Intelligence Scale (“WAIS III”) test to Albarran and determined that his IQ was 71. It was Dr. Weinstein’s opinion that Albarran was borderline mentally retarded and that he was functioning at a fourth-grade level. The State presented the testimony of two individuals who had made deliveries to the restaurant and had dealt with Albarran. Both said that they did not believe that Albarran had any mental problems. The circuit court entered a detailed order sentencing Albarran to death.

Standard of Review

Because Albarran has been sentenced to death, this Court, according to Rule 45A, Ala. R.App. P., must search the record for “plain error.” Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“ ‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).”
11 So.3d at 938. “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” See Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). While Albarran’s failure to object will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343, 352 (Ala.Crim.App.1991).

Guilt-Phase Issues

I.
Albarran first argues that his statement to police should have been suppressed because he was not properly informed of his *148 Miranda[1] rights in Spanish; therefore, he was unable to knowingly and voluntarily waive those rights. He also argues that the rights afforded him under the Vienna Convention on Consular Relations (“the Vienna Convention”) were violated because law-enforcement officials failed to notify him of his right to speak to a consul from the Mexican Embassy, that the cultural barriers interfered with his ability to waive his Miranda rights, and that his low intellect rendered him incapable of waiving his rights.
Before trial, Albarran filed a 31-page motion to suppress his statement to police, and a hearing was held on the motion. (C.R. 149.) Issues regarding the motion to suppress his statement are now raised on appeal.
In McLeod v. State, 718 So.2d 727 (Ala.1998), the Alabama Supreme Court explained:
“For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person ... shall be compelled in any criminal case to be a witness against himself....’ Similarly, § 6 of the Alabama Constitution of 1901 provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.’ These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. *149 denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is “whether the defendant’s will was overborne at the time he confessed’) (emphasis added).”
718 So.2d at 729 (footnote omitted).
A.
First, Albarran argues that he could not effectively waive his Miranda rights because the interpreter’s translation of the rights was flawed. Specifically, he asserts that the interpreter used a word that does not exist in the Spanish language — “silento”—when translating the word “silent” and that the interpreter informed him that a lawyer would be “selected for him” and not “appointed at the State’s expense.”
The United States Supreme Court has stated the following concerning Miranda warnings:
“Reviewing courts ... need not examine Miranda warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably ‘conve[y] to [a suspect] his rights as required by Miranda.’ [California v.] Prysock, supra, 453 U.S. [355], at 361 [ (1981) ].”
Duckworth v. Eagan, 492 U.S. 195, 203 (1989). See California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (“Miranda itself indicated that no talismanic incantation was required to satisfy its strictures”).
The United States Court of Appeals for the Tenth Circuit, when addressing the validity of a foreign-speaking defendant’s waiver of his Miranda rights, has stated:
“To determine whether a suspect’s waiver of his Miranda rights was intelligent, we inquire whether the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him. United States v. Yunis, 859 F.2d 953, 964-65 (D.C.Cir.1988). A suspect need not, however, understand the tactical advantage of remaining silent in order to effectuate a valid waiver. Id. at 965. Although language barriers may inhibit a suspect’s ability to knowingly and intelligently waive his Miranda rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated. See United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir.1987). The translation of a suspect’s Miranda rights need not be a perfect one, so long as the defendant understands that he does not need to speak to police and that any statement he makes may be used against him. See, e.g., Yunis, 859 F.2d at 959 (grammatical errors in translated Miranda warning did not render warning constitutionally insufficient); Perri v. Director, Dep’t of Corrections, 817 F.2d 448, 452-53 (7th Cir.) (Miranda warning administered in Italian by police officer with no formal training in Italian in dialect different from defendant’s sufficient to effectuate valid waiver), cert. denied, 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987); United States v. Gonzales, 749 F.2d 1329, 1335 (9th Cir.1984) (waiver valid where defendant appeared to understand Miranda warning administered by officer in broken Spanish).”
*150 United States v. Hernandez, 913 F.2d 1506, 1510 (10th Cir.1990).
In State v. Ortez, 178 N.C.App. 236, 631 S.E.2d 188 (2006), the Court of Appeals of North Carolina considered the adequacy of Miranda warnings given to a Spanish-speaking defendant and stated:
“[DJefendant claims that the Spanish translation of the Miranda rights read to him did not properly convey the right of an indigent defendant to have counsel appointed before questioning. Although the Spanish translation of Miranda warnings used by the Raleigh Police Department in this case contained grammatical errors, we do not find these errors rendered defendant’s Miranda warnings inadequate. The United States Supreme Court has never required Miranda warnings to ‘be given in the exact form described in that decision.’ Duckworth v. Eagan, 492 U.S. 195, 202, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166, 176 (1989). When reviewing the adequacy of Miranda warnings, an appellate court asks ‘simply whether the warnings reasonably “conve[y] to [a suspect] his rights as required by [Miranda ].” ’ Id. at 203, 109 S.Ct. at 2880, 106 L.Ed.2d at 177 (quoting California v. Prysock, 453 U.S. 355, 361, 101 S.Ct. 2806, 69 L.Ed.2d 696, 702 (1981)).
“In the present case, the warnings read to defendant in Spanish reasonably conveyed to defendant his Miranda rights and were therefore adequate. While defendant argues the term ‘corte de ley’ has no meaning in Spanish, when defendant was asked in Spanish whether he understood his rights, defendant answered in the affirmative and signed the bottom of the waiver form. Moreover, a material part of the Miranda warning given — that anything defendant said could be used against him — was preserved in the translation.”
178 N.C.App. at 244-45, 631 S.E.2d at 195. See Annot., Suppression of Statements Made During Police Interview of Non-English-Speaking Defendant, 49 A.L.R.6th 343 (2009).
“Whether an accused understood the Miranda warnings depends on the totality of the circumstances, not solely the skill of the interpreter. Nguyen v. State, 273 Ga. 389(2)(b), 543 S.E.2d 5 (2001). There is no requirement that Miranda warnings be given by a certified translator. In Nguyen, supra, this Court upheld the validity of Miranda warnings administered in Vietnamese by the defendant’s son, who was not a certified interpreter. So long as the accused understands the explanation of rights, an imperfect translation does not rule out a valid waiver. Tieu, v. State, 257 Ga. 281(2), 358 S.E.2d 247 (1987).”
Delacruz v. State, 280 Ga. 392, 394, 627 S.E.2d 579, 583 (2006).
At the suppression hearing, Investigator Charlie Gray of the Huntsville Police Department testified that on August 29, 2005, he interviewed Albarran at the police station at around 9:40 p.m. — approximately six hours after the shooting. Investigator Gray said that he was accompanied by another investigator, Wayne Sharp, and by a Spanish interpreter, Flora Boardman, a Spanish professor at the University of Alabama in Huntsville and a teacher at the Huntsville Police Academy. He said that Albarran was not coerced or promised anything in order to secure his statement. Gray testified that Albarran looked normal, was calm and willing to talk, did not smell of alcohol, and appeared lucid. An audiotape of the interview was offered and admitted at the suppression hearing.
At the hearing, Albarran argued that the Miranda warnings as administered by the interpreter were inadequate because the interpreter’s translation of the warn *151 ings was flawed. Dr. Ricardo Weinstein, a neuropsychologist who was fluent in Spanish, testified that, in his opinion, the Miranda warnings given to Albarran had not been properly translated and that he believed that Albarran’s low intellect inhibited his ability to understand his rights. He said that the interpreter used several phrases that were confusing when translating Albarran’s Miranda rights. First, the interpreter used the word “silento” for “silent.” According to Dr. Weinstein, “si-lento” is not a word in Spanish. Dr. Wein-stein also said that when the interpreter informed Albarran of his right to have an attorney, the interpreter substituted the phrase a lawyer would be “selected for him” for the phrase a lawyer would be “appointed for him.” Dr. Weinstein did testify that most of the dialogue between the interpreter and Albarran was understandable. (R. 1827.) Further, Albarran had been in the United States periodically since 1989 and spoke some English.
A review of the transcript of the translated interview shows that each Miranda right was read to Albarran separately and that after each right was read, Albarran was asked if he understood that particular right. When Albarran had a question, he would ask the interpreter to repeat the information. The translation of the Miranda rights shows that Albarran was informed of the following: “You have the right to stay silent”; “Anything you say can and will be used against you in a court of law”; “You have the right to talk to a lawyer”; “If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish”; and “If you don’t have money for an attorney one will be selected to represent you before we ask you questions if you want.” (S.R. 200-01.) After he was informed of his rights, he indicated that he understood those rights and waived them.
“The Spanish translation of the Miranda form given to [Albarran] clearly expressed the required concepts; any deviation was at most minor and inconsequential.” Delacruz, 280 Ga. at 394-95, 627 S.E.2d at 583. Accordingly, the circuit court committed no error in denying Al-barran’s motion to suppress his statement to police on the ground that the Miranda rights had not been adequately translated into Spanish.
B.
Second, Albarran argues that he was not given sufficient notice of his right to speak to consular officials from the Mexican Embassy; therefore, the rights granted him by the Vienna Convention were violated. Albarran raised this issue in his motion to suppress his statement to police. (C.R. 149.)
The record shows that during Albarran’s interview he was informed that he had the right to talk to the “Mexican Consulate” and that he had the right to “have the attorney and the consul present with [him]” when he was questioned. (S.R. 200.) Albarran, however, asserts that there were numerous defects in the way he was informed of his right to speak with a consul from the Mexican Embassy.
Even if Albarran were not properly informed of his right to speak to a consul from the Mexican Embassy, the remedy would not be to suppress his statement. In Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008), this Court joined the majority of jurisdictions that have addressed this issue and held that the Vienna Convention does not confer any judicially enforceable rights on individuals. Specifically, this Court stated:
“Many other courts have declined to address this specific issue but have held that the remedies of suppression of evidence or the dismissal of an indictment *152 are not appropriate remedies for a nation’s violation of the Vienna Convention. The United States Court of Appeals for the Eighth Circuit in United States v. Ortiz, 315 F.3d 873 (8th Cir.2002), stated:
“ ‘Again, even assuming that the Convention creates individually enforceable rights, this conclusion does not follow. There is no causal or logical connection at all between the penalty imposed on defendants and violation of the Vienna Convention. The death penalty is provided by statute. It comes into the case, of course, only after defendants are convicted.... The Convention itself says nothing about the appropriateness of penalties, and certainly does not provide that the death penalty is excluded if the Convention is violated. We do not believe that courts are authorized to create such a remedy.’
“315 F.3d at 887. See also United States v. Duarte-Acero, 296 F.3d 1277, 1282 (11th Cir.2002) (‘[T]he Convention nowhere suggests that the dismissal of an indictment is an appropriate remedy for a violation. See United States v. Page, 232 F.3d 536, 540 (6th Cir.2000); [United States v.] Li, 206 F.3d [56,] 62 [ (1st Cir.2000) ].’); United States v. Lawal, 231 F.3d 1045, 1048 (7th Cir.2000) (In [United States v.] Chaparro-Alcantara, [226 F.3d 616 (7th Cir.2000),] we determined that since there is no general exclusionary rule for international law violations, suppression of evidence is appropriate “only when the treaty provides for that remedy.” See 226 F.3d at 623-24. We read Article 36 as not providing such an extraordinary remedy. See Id. at 624-25.’); United States v. Minjares-Alvarez, 264 F.3d 980, 986-87 (10th Cir.2001) (‘There is no evidence that the Vienna Convention’s drafters intended to remedy violations of Article 36 through the suppression of evidence.’); Garcia v. State, 117 Nev. 124, 128, 17 P.3d 994, 997 (2001) (‘The State Department has rejected the proposition that Vienna Convention violations warrant evidence suppression or case dismissal, and instead has concluded that the only remedies are diplomatic or political or exist between states under international law.’).”
Sharifi, 993 So.2d at 918.
Because a violation of the Vienna Convention does not require the suppression of a statement, the circuit court correctly denied Albarran’s motion on this ground. Therefore, Albarran is not due any relief on this issue.
C.
Albarran next argues that his statement was due to be suppressed because of cultural barriers that, he claims, interfered with his ability to intelligently waive his Miranda rights. To support his assertions, Albarran cites United States v. Garibay, 143 F.3d 534 (9th Cir.1998).
In Garibay, the Spanish-speaking defendant was given his Miranda rights in English. The United States Court of Appeals for the Ninth Circuit held that Garibay’s statement should have been suppressed because of his difficulty understanding English. 143 F.3d at 538. Garibay has no application to this case because Albarran was given his Miranda rights in Spanish.
Furthermore, Albarran had lived periodically in the United States for many years and managed a restaurant. There is no indication that any cultural barriers interfered with Albarran’s ability to knowingly and intelligently waive his Miranda rights.
D.
Albarran also argues that his statement was due to be suppressed be *153 cause his limited intellectual capacity rendered him incapable of waiving his Miranda rights.
“Having a low IQ will not render a waiver ineffective unless the individual’s IQ is so low that the person attempting to waive his rights absolutely cannot understand his Miranda rights. Arnold v. State, 448 So.2d 489 (Ala.Crim.App.1984).
“ ‘We have often held that “the fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary.” See Colorado v. Connelly, 479 U.S. 157, 163-65, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); Baker v. State, 599 So.2d 60, 63 (Ala.Cr.App.1991), State v. Austin, [596 So.2d 598 (Ala.Cr.App.1991) ] supra, Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).’
“Youngblood v. State, 656 So.2d 385, 387 (AIa.Cr.App.1993).
“ ‘[A] defendant’s mental impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. See generally Annot., 8 A.L.R.4th 16 (1981). “While an accused’s intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible.” Hobbs v. State, 401 So.2d 276, 282 (Ala.Cr.App.1981).’
“Whittle v. State, 518 So.2d 793, 796-97 (Ala.Cr.App.1987).
“Although it is undisputed that the appellant’s mental capabilities were below average, but ‘average’ is the middle mark, there is no evidence that the appellant could not understand that he had the right to remain silent and that he had the right to an attorney. The court did not err in receiving the appellant’s confession into evidence at trial.”
Dobyne v. State, 672 So.2d 1319, 1337 (Ala.Crim.App.1994).
“In this case, no rebuttal testimony was offered to the evidence that the appellant’s mental capacity was below average. However, there was absolutely no evidence presented that the appellant’s mental capacity was so low that she could not understand her Miranda rights. The appellant indicated that she understood these rights, and she signed a waiver of rights form. There was testimony that the appellant did not appear to be under the influence of alcohol or drugs, was not offered any reward, and was not threatened or induced to make a statement. The court did not err in receiving the appellant’s confession into evidence at trial.”
Turley v. State, 659 So.2d 191, 194 (Ala.Crim.App.1994).
At the suppression hearing, Dr. Wein-stein testified that he administered the Spanish version of the IQ tests to Albar-ran, that he determined from the results of those tests that Albarran’s IQ was 71, and that it was his opinion that Albarran was mildly mentally retarded. He admitted on cross-examination that Albarran was depressed and that that would affect his IQ scores. He further testified that Albarran did, in fact, understand some of the Miranda rights. (R. 1843.) The State presented evidence indicating that Albarran was the manager of a restaurant and regularly conducted business without trouble. Further, each right set out in Miranda was read to Albarran separately and after each right was read, Albarran was asked if *154 he understood that particular right. When Albarran had a question, he would ask the interpreter to repeat the information: After he was informed of his rights, he indicated that he understood those rights, and he waived them. Based on the conflicting evidence, this Court cannot say that the circuit court abused its discretion in finding that Albarran was not “so mentally impaired that he did not understand his Miranda rights.” Beckworth v. State, 946 So.2d 490, 517 (Ala.Crim.App.2005) (citations and quotations omitted).
E.
Finally, even if Albarran’s statement were erroneously admitted for any reason, this Court would find that the error was harmless beyond a reasonable doubt. In Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court held that the erroneous admission of a defendant’s confession may be harmless.
“ ‘When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.’
“[Arizona v. Fulminante,] 499 U.S. [279] at 310, 111 S.Ct. 1265, 113 L.Ed.2d 332 [ (1991) ]. (Emphasis added.) ‘In order for the harmless error doctrine to be applied in this situation, the evidence against the accused must be overwhelming.’ McCray [v. State ], 629 So.2d [729] at 732 [ (Ala.Crim.App.1993) ], Smith v. State, 623 So.2d 369, 372 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993).”
Fisher v. State, 665 So.2d 1014, 1018 (Ala.Crim.App.1995).
Albarran’s statement was not inculpato-ry. Albarran never admitted that he shot Officer Golden but repeatedly said that he was not there when the shooting occurred. Further, the State presented overwhelming evidence of Albarran’s guilt, including multiple eyewitness accounts of Albarran shooting Officer Golden. Therefore, the admission of Albarran’s statement was harmless beyond a reasonable doubt. See Arizona v. Fulminante, supra.
II.
Albarran next argues that the circuit court erred in requiring him to wear a “stun belt” during his trial. Specifically, he argues that forcing him to wear the device deprived him of the presumption of innocence, hindered his right to confer with his attorney, and violated his right to a fair trial.
The record shows that Albarran orally objected to the use of the stun belt and that a hearing was held on his objection. (R. 554.) A memorandum detailing the police department’s policies and procedures on the use of the stun belt was admitted into evidence at the hearing. (Supp. R. 21-23.) The memorandum stated that the device would emit a shock for eight seconds when activated and that it would be activated in the following circumstances:
“(1) Any attempt to escape or to assault the Court, Courtroom staff, Sheriff Department employee, or any other individuals) within the courtroom.
“(2) Any outburst or movement which appears threatening, threatening to escape, or assault.
“(3) Any failure to comply with verbal direction of the custodial department employee. Any attempt to remove the E.S.D. (‘electronic stun device’) or other physical restraints.
*155 “(4) Anytime the wearer moves out of sight of the custodial or control department employee.”
(Supp. R. 21-22.)
Sgt. Manuel Ray Simmons testified concerning the stun belt Albarran was wearing. The device was five or six inches wide, was strapped around Albarran’s waist, and was capable of being activated by a remote control. Albarran’s belt was not visible because he was wearing a jacket over it. The belt incapacitates the wearer when it is activated. Sgt. Simmons testified that it was the police department’s policy to have individuals on trial for capital murder wear the belt because they were not restrained in any other way, i.e., Albarran was not wearing handcuffs or shackles.
The circuit court held that, based on the totality of the circumstances, the use of the stun belt was proper. In support of its ruling, the circuit court cited security concerns caused by the poor layout of the courthouse, the fact that the belt was not visible to the jury and was used in lieu of handcuffs and shackles, and the department’s policy on the use of the device. (R. 1022-24.) There is no indication that the stun belt was a hindrance to Albarran during the trial or that thé belt was activated during any of the proceedings.
This Court has approved the use of a stun belt as a security measure in a capital-murder trial. See Hyde v. State, 13 So.3d 997 (Ala.Crim.App.2007); Belisle v. State, 11 So.3d 256 (Ala.Crim.App.2007); Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003). In Snyder, this Court upheld the use of a stun belt in Snyder’s capital-murder trial after the court held a hearing on the issue and made a determination on the record that the use of the stun belt was appropriate. See also State v. Were, 118 Ohio St.3d 448, 464, 890 N.E.2d 263, 283 (2008) (“A trial court can require the use of stun belts when the prosecution justifies their use on the record.”); Annot., Propriety and Prejudicial Effect of Gagging, Shackling, or Otherwise Physically Restraining Accused During Course of State Criminal Trial, 90 A.L.R.3d 17 (1979).
As the State of Florida stated when addressing a similar issue:
“[The appellant] further argues that the jury was prejudiced because he had to wear a stun belt during trial and that the use of this stun belt implied his guilt. A trial judge has discretion when it comes to the issue of whether or not to restrain the defendant. See Elledge v. State, 408 So.2d 1021, 1023 (Fla.1981). The record clearly reflects that although the trial court found the belt necessary because of the magnitude of the case, it also found that Smith could not be prejudiced by its use because it was not visible to anyone, including the judge. It is true that while restraints are sometimes necessary, a defendant generally has the right to appear free from restraint while in front of the jury. See Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). However, we have held that the use of a stun belt is allowed because it is less visible than the alternative of shackles. See Weaver v. State, 894 So.2d 178, 195 (Fla.2004). Because the stun belt was not visible, Smith appeared free from restraint and, as a result, he was not prejudiced.”
Smith v. State, 7 So.3d 473, 493-94 (Fla.2009). Also,
“[W]e cannot conclude that the district court abused its discretion under controlling precedent. The district court appropriately justified the measure through the articulation of defendant-specific security concerns, and it mini *156 mized the risk of prejudice, after considering the unacceptability of other, more visible measures. And there is no current well-settled law that would support Mr. Wardell’s stun-belt objection based upon detrimental psychological impact under plain error review.”
United States v. Wardell, 591 F.3d 1279, 1298 (10th Cir.2009).
Here, the circuit court complied with this Court’s decision in Snyder and held a hearing on whether the use of the stun belt was appropriate. Based on the record, this Court finds no evidence that the circuit court abused its discretion in approving the use of the stun belt in this case. Consequently, Albarran is not entitled to any relief based on this issue.
III.
Albarran next argues that the circuit court committed errors during the jury-selection process and that those errors undermined his ability to obtain a fair and impartial jury. This Court disagrees.
A.
First, Albarran contends that the circuit court failed to conduct an adequate investigation after prospective juror D.B.[2] informed the court that a fellow venire-member had made a statement to her about Albarran’s guilt.
During voir dire examination, prospective juror D.B. informed the circuit court that another prospective juror had told her that “Albarran was guilty [and] no one could convince him otherwise.” (R. 818.) D.B. said that she got up and walked away because she knew that she should not be listening to that juror’s opinion. She further said that another prospective female juror was present, but that that prospective juror had been excused from jury service. D.B. described what the prospective juror who made the comment was wearing, and defense counsel indicated that that juror had also been excused from jury service. (R. 820.) The court then asked D.B. whether she could set aside what she had heard and render a decision based solely on the evidence. D.B. indicated that she could.
After D.B. indicated that she could set aside what she had heard, defense counsel made no objection to the circuit court’s method of handling the situation. Thus, this Court reviews this issue for plain error only. See Rule 45A, Ala. R.App. P.
“[W]hen the trial judge acts promptly to investigate the circumstances surrounding the making of an inherently prejudicial remark [to] a veniremember, determining specifically whether the remark was made and whether the remark had a prejudicial effect on those who, ultimately selected to serve as jurors, heard it, there is no error in the denial of a motion for mistrial based on jury contamination.”
Holland v. State, 588 So.2d 543, 548 (Ala.Crim.App.1991).
“What constitutes a ‘reasonable investigation of irregularities claimed to have been committed’ will necessarily differ in each case. A significant part of the discretion enjoyed by the trial court in this area lies in determining the scope of the investigation that should be conducted.
“ ‘Th[e] discretion of the trial court to grant a mistrial includes the discretion to determine the extent and type of investigation requisite to a ruling on the motion. United States v. Flynn, 216 F.2d 354, 372 (2d Cir. *157 1954)[, cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955) ]; Lewis v. United States, 295 F. 441 (1st Cir.1924)[, cert. denied, 265 U.S. 594, 44 S.Ct. 636, 68 L.Ed. 1197 (1924)]; Tillman, [v. United States, 406 F.2d 930 (5th Cir.), vacated on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969) ]; Killilea v. United States, 287 F.2d 212 (1st Cir.1961)[, cert. denied, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259 (1961) ]; United States v. Khoury, 539 F.2d 441 (5th Cir.1976)[, cert. denied, 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977) ]. A full evidentiary hearing at which witnesses and jurors can be examined and cross examined is not required. Tillman, supra, 406 F.2d [at] 938. The trial judge need not examine the juror to determine if that juror admits to being prejudiced before granting a mistrial.’
“Woods v. State, 367 So.2d 974, 980 (Ala.Cr.App.), reversed on other grounds, 367 So.2d 982 (Ala.1978), partially quoted in Cox v. State, 394 So.2d 103, 105 (Ala.Cr.App.1981). As long as the court makes an inquiry that is reasonable under the circumstances, an appellate court should not reverse simply because it might have conducted a different or a more extensive inquiry.”
Sistrunk v. State, 596 So.2d 644, 648-49 (Ala.Crim.App.1992). See also Taylor v. State, 808 So.2d 1148, 1174 (Ala.Crim.App.2000); Burgess v. State, 827 So.2d 134, 157 (Ala.Crim.App.1998); Hamilton v. State, 680 So.2d 987, 993 (Ala.Crim.App.1996).
Contrary to Albarran’s assertions, the record indicates that the circuit court’s investigation was reasonable. The circuit court determined that the potential juror who made the comment had already been removed from the venire. Likewise, the one other potential juror who, aside from D.B., had overheard the comment had already been removed from the venire. Further, D.B. was questioned and stated that she could be impartial. There is no indication from the record that other members of the venire were present and heard the prospective juror’s comments. Accordingly, this Court concludes that no error occurred in the circuit court’s method of handling the matter. See Sistrunk, 596 So.2d at 648-49.
B.
Second, Albarran argues that the circuit court erred in refusing his request for the State to provide him with the criminal records of all the potential jurors.
Albarran filed a pretrial motion requesting that the circuit court direct the State to furnish the defendant with the criminal and arrest records of all the prospective jurors who were called for Albarran’s trial. (C.R. 259.) At a pretrial hearing, the circuit court denied the motion. (R. 466.)
This Court has repeatedly held that a circuit court commits no error in denying a defendant’s motion for discovery of the criminal records of prospective jurors. As this Court stated in Kelley v. State, 602 So.2d 473 (Ala.Crim.App.1992):
“This Court has held that arrest and conviction records of potential jurors do not qualify as the type of discoverable evidence that falls within the scope of Brady [v. Maryland, 373 U.S. 83 (1963),] and that a trial court will not be held in error for denying an appellant’s motion to discover such documents. Slinker v. State, 344 So.2d 1264 (Ala.Cr.App.1977). Cf., Clifton v. State, 545 So.2d 173 (Ala.Cr.App.1988) (the nondisclosed evidence was not exculpatory, thus Brady was inapplicable). In other words, the appellant does not have an absolute right to the disclosure of the arrest and con *158 viction records of prospective jurors. See Slinker, supra. Cf., Davis v. State, 554 So.2d 1094 (Ala.Cr.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), rehearing overruled, 569 So.2d 738 (Ala.1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (defendant is not entitled to the general disclosure of the criminal records of the state’s witnesses); Wright v. State, 424 So.2d 684 (Ala.Cr.App.1982) (No absolute right to disclosure of criminal records of state’s witnesses).
“Several jurisdictions have similarly held. See e.g., People v. Murtishaw, 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 (1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982) (trial judge has discretionary authority to permit defense access to jury records); Moon v. State, 258 Ga. 748, 375 S.E.2d 442 (1988), cert. denied, 499 U.S. 982, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991) (trial court did not err in denying defendant’s motion for pretrial discovery of state’s juror information records); State v. Wiggins, 556 So.2d 622 (La.App.1990) (defendant is not necessarily entitled to ‘rap sheets’ of prospective jurors); State v. Weiland, 540 So.2d 1288 (La.App.1989) (defendant is not entitled to rap sheets of prospective jurors because those records are useful to state in its desire to challenge jurors with inclinations or biases against state, but are not pertinent to purpose of defendant’s voir dire: to challenge jurors who defendant believes will not approach the verdict in a detached and objective manner); State v. Childs, 299 S.C. 471, 385 S.E.2d 839 (1989) (no right to discovery of criminal records of potential jurors absent statute or court rules requiring such disclosure); Jeffrey F. Ghent, Annot., Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors, 86 A.L.R.3d 571, § 4(a) (1978), and the cases cited therein.
“Also, the state has no duty to disclose information that is available to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr.App.1985). Here, the appellant could have procured this information from the venire-members themselves during voir dire. See also Clifton, supra (nondisclosure did not prejudice appellant’s defense).”
602 So.2d at 477-78. See also Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010); Phillips v. State, 65 So.3d 971 (Ala.Crim.App.2010); Brown v. State, 982 So.2d 565 (Ala.Crim.App.2006); Hall v. State, 816 So.2d 80 (Ala.Crim.App.1999); David v. State, 740 So.2d 1142 (Ala.Crim.App.1998); Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996); Williams v. State, 654 So.2d 74 (Ala.Crim.App.1994).
Because Albarran was not entitled to discovery of the criminal and arrest records of potential jurors, the circuit court did not err in denying Albarran’s motion seeking such information. Therefore, Al-barran is not entitled to any relief based on this issue.
IV.
Albarran next argues that the circuit court erred in refusing to remove several prospective jurors for cause because those prospective jurors’ responses to questions during voir dire indicated that they were biased against him.
“ ‘ “A trial judge’s finding on whether or not a particular juror is biased ‘is based upon determination of demeanor and credibility that are peculiarly within a trial judge’s province.’ [Wainwright v.] Witt, 469 U.S. [412] 429, 105 S.Ct. [844] 855 [(1985)]. That finding must be accorded proper *159 deference on appeal. Id. ‘A trial court’s rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.’ Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).” ’ ”
Dallas v. State, 711 So.2d 1101, 1107 (Ala.Crim.App.1997) (quoting Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App. 1988)). “ ‘[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.’ ” Sharifi v. State, 993 So.2d 907, 926 (Ala.Crim.App.2008) (quoting Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000)).
“ ‘[T]he test for determining whether a strike rises to the level of a challenge for cause is “whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.” Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). “Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.” Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). “The decision of the trial court ‘on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.’ ” Nettles, 435 So.2d at 153.’ ”
Sneed v. State, 1 So.3d 104, 136 (Ala.Crim.App.2007) (quoting Dunning v. State, 659 So.2d 995, 996 (Ala.Crim.App.1994)).
With these principles in mind, this Court reviews the challenged prospective jurors.
A.
First, Albarran argues that the circuit court erroneously failed to grant his motion to remove prospective juror J.J. for cause on the ground that she indicated in her juror questionnaire that she felt that a defendant who did not testify in his own behalf was hiding something.
J-J.’s juror questionnaire shows that she checked “yes” to question number 80, which asked: “Do you feel if someone does not testify that he or she must be hiding something? Beside the checked “yes” is the word “maybe” and the following explanation: “If info has already taken me in that direction.” During the voir dire examination of prospective juror J.J., the following occurred:
“[Defense counsel]: How important is that to you? Because, you know, you seemed in here like it’s important and your questionnaire’s pretty definitive about that. So it sounds like to me that’s deeply held view or feeling.
“[J.J.]: It is but I still understand the legal system and I would try to be fair about it.
“[Defense counsel]: Oh, sure. Of course.
“[J.J.]: Yeah.
“[Defense counsel]: Of course. At the same time it would be a struggle? Would it be difficult for you to set aside your feelings that he might be hiding something or — or it would be easy?
“[J.J.]: It wouldn’t be easy but I could do it.
[[Image here]]
“[Prosecutor]: You do believe that [the] Defendant sitting right there has the right to not take the stand, right?
“[J.J.]: I certainly do.
“[Prosecutor]: And you’re not going to hold that — I’m not hearing you’re going to hold that against him.
“[J.J.]: I’m certainly not going to hold that against him.
“[Prosecutor]: In fact, what I’m kind of hearing from you is that you would won *160 der about your vote of guilty because you kind of want to hear from him but you’re not going to hold it against him that he didn’t talk, right?
“[J.J.]: That’s correct.
“[Prosecutor]: Okay. And you will follow the judge’s instructions to that effect, right?
“[J.J.]: I certainly would.”
(R. 1047-53.)
Prospective juror J.J. clearly stated that she could follow the law as instructed by the court and would not hold Albarran’s failure to testify against him. Therefore, the circuit court did not abuse its discretion by denying Albarran’s challenge to prospective juror J.J. on the ground that she would like for Albarran to testify. See Sharifi, 993 So.2d at 926.
Albarran also asserts that J.J. indicated that she would not consider “expressions of a defendant’s impoverished or unstable childhood” as mitigating evidence. This assertion is refuted by the record and is without merit.
On the juror questionnaire, J.J. responded to the following question: “In your opinion, is the death penalty the only appropriate sentence for someone who has been proven guilty beyond a reasonable doubt of intentional murder?” J.J. wrote, “No. Always mitigating circumstances.” (Supp. R. 271.) When read in full, J.J.’s responses during voir dire regarding the mitigating circumstance that a defendant had an impoverished or unstable childhood indicated that the weight she could place on that mitigating circumstance would depend on the facts of the case. (R. 1050-51.) Specifically, J.J. indicated that the weight she would place on a mitigating circumstance involving a defendant’s childhood would depend on “how many years [the defendant has had] to rise above what happened in [his] childhood.” (R. 1051.) JJ.’s view that childhood traumas become less mitigating with the passage of time is not unreasonable. Cf. Francis v. Dugger, 908 F.2d 696, 703 (11th Cir.1990) (holding that “evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight” because the defendant was 31 years old when the crime was committed); Callahan v. Campbell, 427 F.3d 897, 937 (11th Cir.2005) (holding that “[w]hen a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal”). Therefore, the circuit court did not abuse its discretion by denying Albarran’s challenge to J.J. for cause.
Moreover, there is no requirement that a court strike a juror based on his/her feelings towards certain types of mitigating evidence. The United States Supreme Court in Morgan v. Illinois, 504 U.S. 719, 727, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), held that a capital defendant is entitled to question prospective jurors about their views in favor of capital punishment:
“A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror.”
504 U.S. at 729. In interpreting the scope of the United States Supreme Court’s decision in Morgan, the Alabama Supreme Court has held:
“[R]ather than simply attempting to identify those jurors who were not impartial and who would vote for the death penalty in every case regardless of the facts, Taylor’s counsel sought to identify any prospective juror who would vote *161 for death under the facts of this particular case and then to eliminate that prospective juror by using strikes for cause. The due process protections recognized in Morgan do not extend that far. Accordingly, we conclude that [the prospective jurors] were impartial prospective jurors who would not automatically vote for the death penalty in every case. The trial court did not err in refusing to strike them for cause on that basis.”
Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995), disagreed with on other grounds, Ex parte Borden, 769 So.2d 950 (Ala.2000) (emphasis in original). Other courts have followed our Supreme Court’s interpretation of Morgan.
“Morgan requires that defendants be afforded an opportunity during voir dire to identify, and to strike for cause, prospective jurors who would automatically impose the death penalty once guilt is found. See [State v.] Glassel, 211 Ariz. [33] 45-46, 116 P.3d [1193] 1205-06 [ (2005) ]. Morgan does not, however, entitle defendants to ask prospective jurors to identify circumstances they would find mitigating or to answer open-ended questions about their views on mitigation.”
State v. Moore, 222 Ariz. 1, 18, 213 P.3d 150, 167 (2009).
“Glassel contends that Morgan gives defendants the right to question a prospective juror to assess the likelihood that the prospective juror will assign substantial weight to the mitigation evidence the defendant plans to offer. Morgan’s holding, however, is considerably narrower: ‘[Defendants have a right to know whether a potential juror will automatically impose the death penalty once guilt is found, regardless of the law,’ and ‘[t]hus, defendants are entitled to address that issue during voir dire.’ State v. Jones, 197 Ariz. 290, 303, 4 P.3d 345, 358 (2000) (construing Morgan).”
State v. Glassel, 211 Ariz. 33, 45, 116 P.3d 1193, 1205 (2005). See also Trevino v. Johnson, 168 F.3d 173 (5th Cir.1999).
Because a prospective juror is not disqualified from serving on a capital jury based on that juror’s views of certain types of mitigation, the circuit court committed no error in failing to remove prospective juror J. J. for cause based on her responses to questions concerning certain types of mitigating evidence. Therefore, Albarran is not entitled to any relief based on this issue.
B.
Second, Albarran asserts that the circuit court erred in not granting his motion to remove prospective juror T.B. for cause on the ground that T.B. indicated that he believed that the only sentence for an “intentional, cold-blooded murder” was the death penalty.
The following occurred during the voir dire examination of T.B.:
“[Prosecutor]: I want to be clear that you’re clear on really the process here. Because as [defense counsel] asked you questions about if it’s a cold-blooded murder then you say death penalty.
“[T.B.]: Yes, I agree in that—
“[Prosecutor]: In that sparse example. But what I’m saying to you is hypothetically, a guy is convicted of a cold-blooded murder, beyond a reasonable doubt, capital murder. You go into a second phase of a capital murder case and at that phase the State can present to the jury what are called aggravating circumstances or factors that would lend themselves towards a jury voting for death. And, additionally, the Defense has the opportunity to present mitigating circumstances, whatever it may be. It *162 might be about his background, it might be about the emotional state he was in, the circumstances of the case. And the jury is to weigh those factors and then either vote for death or for life without.
“And all I want to know is do you believe you’re able to have an open mind about getting to that phase and considering the possibility of, I’ve listened to aggravating, I’ve listened to mitigating and I can consider either life without or death?
“[T.B.]: Yes, sir. I could.”
(R. 1109-10.) The court further questioned this juror and he indicated again that he could make his decision based on the facts and evidence that were presented in the case. (R. 1111.)
It is well settled that “ ‘jurors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.’ Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000).” Sharifi v. State, 993 So.2d at 926. Here, after prospective juror T.B. indicated that he would be in favor of the death penalty, he further stated that he would consider mitigating circumstances and that he “could consider both punishments, life without parole and death_” (R. 1113.) Therefore, the circuit court committed no error in failing to remove juror T.B. for cause.
C.
Third, Albarran argues that the circuit court erred in failing to remove prospective juror B.H. for cause because, he says, he indicated that the death penalty was the only punishment for someone who killed a police officer.
B.H.’s juror questionnaire shows that he responded that he would “not” automatically vote for the death penalty. On question number 96, he was asked to detail the circumstances under which he would consider voting for the death penalty and he wrote: “Murder of a police officer while on duty and potential of premeditated murder.” (R. 1384-85.) During the individual voir dire of B.H. the following occurred:
“[Prosecutor]: But the question is could you consider whatever mitigation they might put forth and weigh it? Again, I’m not asking you do you think you’re going to come on life without instead of death? I’m not asking you that.
“[B.H.]: Correct.
“[Prosecutor]: I’m just asking you could you consider and is there a possibility that it could—
“[B.H.]: Yes, sir.
“[Prosecutor]: — outweigh it?
“[B.H.]: Yes, I could.”
(R. 1378.) After B.H. was questioned, defense moved that B.H. be removed for cause. The circuit court reserved ruling on the motion until it had an opportunity to further examine the United States Supreme Court’s decision in Morgan. (R. 1384.) Sometime later, the circuit court denied the motion to remove B.H. for cause. (R. 1649.)
B.H. indicated that he would not automatically vote for the death penalty and that he would consider the evidence presented in mitigation. The circuit court committed no error in failing to remove B.H. for cause. See Sharifi, 993 So.2d at 926.
Moreover, even if the circuit court erred in failing to remove B.H. for cause, that error was harmless beyond a reasonable doubt. Rule 45, Ala. R.App. P. “[T]he Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. Bethea v. Springhill Mem’l Hosp., 833 So.2d 1 (Ala.2002).” Pace v. State, 904 So.2d 331, 341 *163 (Ala.Crim.App.2003). But see Ex parte Colby, 41 So.3d 1, 7 (Ala.2009) (holding that erroneously denying multiple challenges for cause is not harmless). Here, defense counsel used a peremptory strike to remove prospective juror B.H.; therefore, any error was harmless. See Pace, 904 So.2d at 341.
V.
Albarran next argues that the circuit court erred in denying his motion in limine to prevent the State from referencing Al-barran’s immigration status. Specifically, Albarran argues that the erroneous admission of information concerning his illegal immigration status constituted reversible error. He cites State v. Avendano-Lopez, 79 Wash.App. 706, 904 P.2d 324 (1995), and Sandoval v. State, 264 Ga. 199, 442 S.E.2d 746 (1994), in support of his argument.
The record shows that Albarran filed a pretrial motion seeking to bar certain prosecutorial arguments. In the 28-page motion, Albarran asserted that the State should be prevented from arguing “the immigration status of the defendant.” (C.R. 283.) During a pretrial-motion hearing, the circuit court indicated that it was denying the motion because Albarran had already injected his status into the proceedings when he inserted questions on the juror questionnaire that related to his Mexican citizenship. (R. 867.)[3] The record also shows that several times during voir dire examination, defense counsel asked the jurors how they felt about Al-barran’s not having “met his legal status yet” and about Albarran’s being an “undocumented worker.” (R. 1275, 1137.) This Court agrees -with the circuit court that Albarran was the first to inject his immigration status into the proceedings.
In State v. Avendano-Lopez, the prosecutor asked the defendant on cross-examination: “You are not legal in this country, are you?” The Washington Court of Appeals, in finding reversible error, stated:
‘We do not condone any reference to a person’s race which is intended to slur or to disparage either the person or the race.... [The references’] effect may have been to impugn the standing of the defendants before the jury and intimate that the defendants would be more likely than those of other races to commit the crime charged. Such an inference is improper and prejudicial.”
79 Wash.App. at 719, 904 P.2d at 331 (footnote omitted). In Sandoval v. State, 264 Ga. 199, 442 S.E.2d 746 (1994), the Supreme Court of Georgia held that evidence of the defendant’s immigration status was inadmissible because it was not relevant to any issue in the case. However, in finding no reversible error, the Georgia Supreme Court stated:
“[W]e cannot agree with appellant that reversible error was committed. The factors we have considered include the non-accusatory manner in which the prosecutor framed the question, the lack of further comment by the State on appellant’s immigration status, and the overwhelming nature of the evidence of *164 appellant’s guilt adduced at trial, with all the eyewitnesses testifying that appellant fired the shot from outside the bar and the absence of any evidence to corroborate appellant’s testimony that he fired the shot in self-defense during his struggle with the victim inside the bar. Even assuming, arguendo, that the erroneous admission of appellant’s immigration status rose to the level of constitutional magnitude, ‘the record does not establish that the [prosecutor’s one question] “so tainted the entire trial that it denied [appellant] that fundamental fairness which is the essence of due process.” [Cit.]’ Baca v. Sullivan, 821 F.2d 1480, 1484 (10th Cir.1987). We are satisfied beyond a reasonable doubt that the error was harmless.”
264 Ga. at 200-01, 442 S.E.2d at 747-48.
A.
First, Albarran argues that it was reversible error to allow the prosecutor to cross-examine Dr. Silva about whether he was aware that Albarran had been deported. This Court disagrees.
Dr. Silva, a defense expert, testified concerning Albarran’s mental state at the time of the offense. The report that Dr. Silva compiled on Albarran was admitted into evidence as Defense Exhibit 44. (R. 4518.) Dr. Silva concluded that Albarran “suffered from various psychiatric disorders,” that Albarran “was suffering from several psychiatric disorders at the time of the instant offense,” that “there are psychiatric and psychosociocultural factors that help clarify the nature of the instant case,” and that “as a result of severe mental disease or defect, Mr. Albarran was unable to appreciate the nature and qualify or wrongfulness of his acts at the time of the commission of the acts constituting the offense.”
On cross-examination, the prosecutor questioned Dr. Silva about the information that Dr. Silva had relied on to arrive at his conclusions. The prosecutor asked Dr. Silva if he was aware of Albarran’s prior criminal record. Defense counsel then made the following objection during cross-examination:
“[Defense counsel]: Here’s what we don’t object to. We don’t object to the fact that [Albarran] has two domestic violence and three DUI arrests because it’s an insanity case. If it wasn’t an insanity case that would be other crimes under the [Ex parte] Drinkard [, 777 So.2d 295 (Ala.2000) ], case and all these other ones. Because it’s insanity we can’t object to the two DUI — the three DUI arrests and the two domestic violence .... ”
(R. 3065.) Defense counsel objected to the admission of one prior instance of domestic violence on the ground that the defense team was not given a certified copy of the offense during discovery. (R. 3061.) Counsel did not, however, object to the introduction of evidence indicating that Al-barran had been deported.
Also,
“The scope of cross-examination in Alabama is quite broad. Rule 611(b), Ala. R. Evid. This means that any question may be asked on cross-examination that is relevant either to any substantive issue in the case or to the witness’s credibility. See Rule 611(b), Ala. R. Evid., Advisory Committee’s Notes. The trial court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence. Rule 611(a), Ala R. Evid.”
Ex parte Deardorff, 6 So.3d 1235, 1241 (Ala.2008).
“ ‘Cross-examination is the principal means by which the believability of a *165 witness and the truth of his testimony-are tested. Subject always to' the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.’
“[Davis v. Alaska,] 415 U.S. [308] 316, 94 S.Ct. 1105 [ (1974) ]. ‘ “The latitude and extent of cross-examination, of necessity, is a matter within the sound discretion of the trial court, and, in the absence of prejudicial abuse, it is not reviewable on appeal.” Turner v. State, 289 Ala. 97, 100, 265 So.2d 883 (1972).’ Ashurst v. State, 462 So.2d 999, 1008-09 (Ala.Crim.App.1984).”
Marshall v. State, 20 So.3d 830, 835 (Ala.Crim.App.2008).
“ ‘It has long been held that “wide latitude” is allowed both the defendant and the state in inquiries into a person’s mental state when an issue as to the sanity of such person is presented.’ Barbour v. State, 262 Ala. 297, 303, 78 So.2d 328, 333 (1954); Peoples v. State, 257 Ala. 295, 58 So.2d 599 (1952); Smith v. State, 257 Ala. 47, 57 So.2d 513 (1952); Hall v. State, 248 Ala. 33, 26 So.2d 566 (1946); Parvin v. State, 248 Ala. 74, 26 So.2d 573 (1946); Eldridge v. State, 247 Ala. 153, 22 So.2d 713 (1945). ‘Where insanity is relied upon as a defense, every act of the accused’s life which throws some light on such issue is relevant thereto.’ Nichols v. State, 276 Ala. 209, 211, 160 So.2d 619, 621 (1964). ‘These inquiries, however, are subject to the necessary limitation that the acts, declarations and conduct inquired about must have a tendency to shed light on the accused’s state of mind when the act for which he is being tried was committed.’ Barbour, supra, 262 Ala. at 303, 78 So.2d at 333.”
Ex parte Vaughn, 869 So.2d 1090, 1095 (Ala.2002).
Here, Albarran first injected his immigration status into the proceedings, and he did not object when Dr. Silva was asked whether he was aware that Albarran had been deported. The question was within the proper scope of the cross-examination of an expert witness, i.e., it tested the depth of Dr. Silva’s knowledge of Albarran and Albarran’s past. Based on the record, this Court cannot say that the admission of this evidence was so egregious that it constituted plain error. See Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999).
B.
Albarran next argues that it was reversible error to allow Dr. Hooper to testify that Albarran had no Social Security number.
Dr. Hooper testified that he had examined Albarran at Taylor Hardin and that Albarran was at the facility for 26 days. He testified that there was no evidence indicating that Albarran had any “abnormality — behavior interactions or anything else.” (R. 3252.) The prosecutor asked Dr. Hooper about what information he relied on to form this opinion. The following occurred:
“[Prosecutor]: And in your report on page two, the — did you note whether or not there was any psychiatric history on Mr. Albarran?
“[Dr. Hooper]: Yes, sir. We were not aware of any psychiatric history in this particular man.
“[Prosecutor]: And what about legal history?
*166 “[Dr. Hooper]: We could not get an NCIC [National Crime Information Center] on him. We didn’t have a Social Security number to process because he is in this country illegally. And the computer crime information center runs on Social Security numbers. Eventually his fingerprints may come back with something but that takes years.”
(R. 3257.)
Albarran did not object to Dr. Hooper’s testimony; therefore, this Court reviews this issue for plain error only. See Rule 45A, Ala. RApp. P. Initially, this Court notes that the above reference to Albar-ran’s having no Social Security number was not elicited by the prosecutor and that Albarran’s status was first injected into the trial by defense counsel.
Further, courts have upheld references to a defendant’s immigration status when that status was relevant to an issue in the case. See United States v. Lopez-Medina, 596 F.3d 716, 739-40 (10th Cir.2010) (“Lopez-Medina’s immigration status is not relevant to whether he committed the crime of possession with intent to distribute but it does counter his suggestion he was a law-abiding citizen wrongly accused of his half-brother’s criminal acts.”); United States v. Lopez, 477 F.3d 1110, 1117 (9th Cir.2007) (“No law supports [the defendant’s] contention that the jury’s knowledge that he was an illegal alien created ‘prejudice of such magnitude that the defendant’s right to a fair trial [was] abridged.’ Unlike evidence of a prior felony conviction, relevant evidence that a person is a previously-deported illegal alien is admissible.” (footnotes omitted))
In distinguishing Avendano-Lopez, the Washington Court of Appeals in State v. Acevedo, 140 Wash.App. 1022 (2007) (unpublished opinion not reported in P.3d), stated:
“The case upon which Mr. Acevedo primarily relies, [State v.] Avendano-Lopez, [79 Wash.App. 706, 904 P.2d 324 (1995) ] is distinguishable. There, the defendant was charged with possession of a controlled substance with intent to deliver. During trial, the prosecutor asked Mr. Avendano-Lopez, ‘“You are not legal in this country, are you?”’ Avendano-Lopez, 79 [Wash.] App. at 718. The court found the question immaterial and solely designed ‘to incite the jury’s passion and prejudice.’ Id. at 719-20. In this case, however, the immigration evidence assisted the jury in understanding both the relationship of the parties and [the defendant’s] motive. Accordingly, we conclude the probative value outweighed the prejudice.”
The fact that Albarran did not have a Social Security number was relevant to explain why the State’s mental-health expert did not have documents relating to Albarran’s criminal history. Further, Albarran’s immigration status was relevant to Albarran’s entire case. Defense counsel argued that cultural barriers interfered with his ability to waive his Miranda rights. At sentencing, counsel argued that Albarran killed Officer Golden because he knew that if he was arrested he would be deported. Based on the record in this case, no error, much less plain error, occurred in the admission of testimony concerning Albarran’s having no Social Security number.[4] See Ex parte Vaughn, supra.
*167 VI.
Albarran next argues that the circuit court erred in allowing the State’s expert to testify concerning a legal conclusion. Specifically, he asserts that the court erred in allowing Dr. Hooper to testify that a substance-induced psychosis did not qualify as a severe mental disease or defect.
The following occurred during the prosecutor’s direct examination of Dr. Hooper:
“The Court: I think, if I understand correctly, [defense counsel is] objecting to him saying voluntary intoxication is not a defense. Now, let me hear from you in that regard.
“[Prosecutor]: What I’m saying is for his purposes, his understanding of severe mental disease or defect, if he hears voluntary intoxication does that take it out of the category of severe mental disease or defect?
“The Court: You can ask him that.
“[Defense counsel]: I don’t have a problem with that.
“The Court: In his opinion. In his opinion?
“[Defense counsel]: Yeah.
“The Court: You can ask him that. Most certainty.
“[Defense counsel]: I don’t object to that.
[[Image here]]
“Q [Prosecutor]: Dr. Hooper, with respect to substance — substance induced psychosis, hypothetically speaking, for your purposes does that qualify as a severe mental disease or defect?
“A [Dr. Hooper]: No, sir.”
(R. 3364-65.) Defense counsel specifically stated that he had no objection to the testimony he now challenges. Thus, if any error occurred, it was invited error.
“ ‘Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.’ Phillips v. State, 527 So.2d 154, 156 (Ala.1988). ‘The doctrine of invited error applies to death-penalty eases and operates to waive any error unless the error rises to the level of plain error.’ Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003).”
Robitaille v. State, 971 So.2d 43, 59 (Ala.Crim.App.2005). See also Saunders v. State, 10 So.3d 53 (Ala.Crim.App.2007); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Whitehead v. State, 955 So.2d 448 (Ala.Crim.App.2006); Scott v. State, 937 So.2d 1065 (Ala.Crim.App.2005); Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003).
Also, the circuit court gave the following instruction immediately before allowing Dr. Hooper to answer the question: “Ladies and gentlemen, as it relates to the law this Court will instruct you as to the law applicable to the facts in this case.” (R. 3365.)
“Alabama case law has traditionally embraced the principle that a witness, whether expert or lay, cannot give an opinion when such constitutes a legal conclusion or the application of a legal definition.” Gamble and Goodwin, McElroy’s Alabama Evidence, § 128.07 (6th ed.2009). Rule 704, Ala. R. Evid., states that “[testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided, by the trier of fact.”
However, in discussing Rule 704, Ala. R. Evid., this Court in Henderson v. State, 715 So.2d 863 (Ala.Crim.App.1997), stated:
“Rule 704, Ala. R. Evid., provides that ‘[testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue *168 to be decided by the trier of fact.’ However, in the case of expert testimony, enforcement of this rule has been lax. C. Gamble, Gamble’s Alabama Rules of Evidence § 704 (1995). We have noted previously in Travis v. State, [776 So.2d 819, 849] (Ala.Cr.App.1997), that expert testimony as to the ultimate issue should be allowed when it would aid or assist the trier of fact, and the fact that ‘ “ ‘a question propounded to an expert witness will elicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper.’ ” ’ (citations omitted); see also Rule 702, Ala. R. Evid. (stating that expert testimony should be allowed when it will aid or assist the trier of fact).”
715 So.2d at 864-65. See also § 12-21-160, Ala.Code 1975, (“The opinions of experts on any question of science, skill, trade or like questions are always admissible, and such opinions may be given on the facts as proved by other witnesses.”).
Here, Dr. Hooper’s testimony aided the trier of fact in understanding whether voluntary intoxication constitutes a disease or defect of the mind. Because Dr. Hooper’s testimony aided the jury in understanding a material fact, i.e., what constitutes a mental disease or defect, no error, much less plain error, occurred in the admission of his testimony. Henderson, 715 So.2d at 864-65.
Moreover, if error did occur, it was harmless. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
“In United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), the Court cited ‘the interest in the prompt administration of justice and the interests of the victims’ in reversing the judgment of a lower federal appellate court for not applying the harmless error doctrine to a prosecutor’s comment on a defendant’s failure to proffer evidence to rebut testimony presented by the prosecution, when the defendant had elected not to testify. 461 U.S. at 509, 103 S.Ct. at 1980. In so holding, the Court observed that ‘[s]inee Chapman [v. California, 386 U.S. 18 (1967) ], the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations,’ id. (citations omitted), and stated that the proper question for a reviewing court to ask is: ‘[A]bsent the prosecutor’s allusion to the failure of the defense to proffer evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?’ Id. at 510-11, 103 S.Ct. at 1981.
“Our harmless error rule provides in pertinent part:
“ ‘No judgment may be reversed or set aside ... on the ground of misdirection of the jury ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.’
“Rule 45, Ala. R.App. P.”
Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993).
Here, the circuit court specifically instructed the jury that substance-induced psychosis did not amount to a severe mental disease or defect. Because the jury was instructed by the court that substance-induced psychosis did not amount to a severe mental disease or defect, any error in the admission of expert testimony *169 to the same effect was harmless beyond a reasonable doubt. See Chapman.
VII.
Albarran next argues that the circuit court erred in allowing the State to assume facts not in evidence during the cross-examination of Dr. Silva and Dr. Wein-stein, both mental-health experts who testified for the defense.
Initially, this Court notes that “ ‘ “[n]ot only is there allowable great latitude on cross-examination of a witness, but this latitude is enlarged as to [an] expert witness.” ’ ” Grayson v. State, 824 So.2d 804, 838 (Ala.Crim.App.1999) (quoting Clements v. Stewart, 595 So.2d 858, 864 (Ala.1992), quoting in turn Louisville & N.R.R. v. Martin, 240 Ala. 124, 132, 198 So. 141, 147 (1940)).
A.
First, Albarran asserts that it was error to question Dr. Silva about a statement that Laura Castrejon, Albarran’s wife, made to police on the day of the shooting because the statement was not admitted into evidence and was hearsay.
The record shows that during direct examination, Dr. Silva testified concerning the contents of a report that he had compiled on Abarran. The State then cross-examined Dr. Silva about what he had relied on in preparing the report. Dr. Silva indicated that he had spoken with Abarran’s wife, that he had seen her statement, and that he had examined the transcript of the 911 telephone call. The following occurred:
“[Prosecutor]: In [paragraph 33] you state, ‘The environmental aspects associated with the incident offense are important in understanding the structure of the incident offense. I am of the opinion that Mr. Abarran exited the restaurant with the intention of leaving. But for the officer victim objectively and reasonably perceiving Mr. Abarran as a threat, and act[ing] accordingly, and Mr. Abarran’s concomitant delusional interpretation of the victim’s actions, this unfortunate event likely would not have occurred.’
[[Image here]]
. “[Prosecutor]: Were you aware that Investigator Gray had interviewed Laura Castrejon after this event and took a statement from her where she provided Charlie Gray information about what happened leading right up to the shooting?
“[Dr. Silva]: Yes, sir.
[[Image here]]
“[Prosecutor]: Would it change your opinion about that paragraph you wrote if you knew that Mrs. Castrejon said to Charlie Gray that when the police— when Daniel Golden arrived that she was talking on the phone and that [A-barran] stayed there. And when he got there that [Abarran] then opened the door and went out and that she went to the kitchen. Okay. But before [Abar-ran] went out, when she called the police officers, he said, ‘Go ahead and call them. I’ll be waiting.’
“[Defense counsel]: And I object to that. That’s a question of about ten different things and I object to it on a number of different grounds, to the interpretation, to the effect that he hadn’t seen it, that’s the prosecutor testifying, and I don’t know that that’s an accurate translation of it.
[[Image here]]
“[Dr. Silva]: Yes. It would not change my opinion because I did ask Mrs. Cas-trejon about that aspect of — that you are talking about. And I also asked Mr. Abarran about. And I also took into *170 account the background speech of the 911 statement.”
(R. 3075-81.)
Rule 705, Ala. R. Evid., specifically provides:
“The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.”
The Advisory Committee’s Notes to Rule 705, Ala. R. Evid., state:
“It is left to the cross-examiner to elicit the facts or data on which the opinion is based, and the witness must, if asked, disclose such information. See Polk v. Ford Motor Co., 529 F.2d 259, 271 (8th Cir.), cert. denied, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976) (holding that ‘[t]he weakness in the underpinnings of such opinions may be developed upon cross-examination and such weakness goes to the weight and credibility of the testimony’). The cross-examiner, of course, is under no obligation to bring out such facts or data and, indeed, may limit inquiry solely to facts or data that are unfavorable to the opinion.”
In discussing the scope of Rule 705, Ala. R. Evid., this Court in Grayson v. State, 824 So.2d 804 (Ala.Crim.App.1999), stated:
“In order to test the credibility of an expert’s testimony, it is permissible for a challenging party to question the witness concerning the completeness and accuracy of his knowledge of the facts that formed the basis for his opinion.
“‘It has been recognized that expert opinion evidence may be rebutted by showing the incorrectness or inadequacy of the factual assumptions upon which the opinion is based, “the reasoning by which he progresses from his material to his conclusion,” the interest or bias of the expert, inconsistencies or contradictions in his testimony as to material matters, material variations between the experts themselves, and defendant’s lack of co-operation with the expert. Also, in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial. In some cases, the cross-examination of the expert may be such as to justify the trier of facts in not being convinced by him. One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony; and, in determining whether such issue is raised, due consideration must be given to the fact that the trier of facts has the opportunity to observe the witness if he testifies in person.’
“Mims v. United States, 375 F.2d 135, 143-44 (5th Cir.1967) (footnotes omitted.) See also United States v. McGraw, 515 F.2d 758, 760 (9th Cir.1975) (‘Once the defendant has introduced sufficient expert testimony to support a reasonable doubt as to sanity, the government must: (1) introduce its own expert testimony in rebuttal; or (2) discredit the defendant’s expert testimony on cross-examination; or (3) rely upon evidence from which the jury may infer that the defendant’s expert testimony depends upon an incorrect view of the facts.’).
[[Image here]]
*171 “In the present ease, the State was using the factual information from the accomplices’ statements in order to challenge the expert witness’s basis for his diagnosis, rather than to prove the truth of the matter asserted. Because the State could properly test the credibility of the expert’s diagnosis by questioning him concerning the information upon which he based his diagnosis, the prosecutor’s questions were introduced for a permissible purpose. ‘ “[N]ot only is there allowable great latitude on cross-examination of a witness, but this latitude is enlarged as to [an] expert witness.” ’ Clements v. Stewart, 595 So.2d 858, 864 (Ala.1992), quoting Louisville and N.R.R. v. Martin, 240 Ala. 124, 132, 198 So. 141, 147 (1940).”
824 So.2d at 837-38.
“Under Rule 705 the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion.” Wilson v. Clark, 84 Ill.2d 186, 194, 49 Ill.Dec. 308, 417 N.E.2d 1322 (1981). “Rule 705 permits inquiry on cross-examination into facts underlying an expert’s opinion even if those facts would be otherwise inadmissible.” Carignan v. New Hampshire Int’l Speedway, Inc., 151 N.H. 409, 417, 858 A.2d 536, 544 (2004). “An expert witness may be cross-examined about facts not in evidence to test the validity of his opinion.” State v. Goodwin, 43 S.W.3d 805, 817 (Mo.2001).
In this case, the prosecutor used the contents of Laura Castrejon’s statements, not to prove the truth of the matters asserted, but to “challenge the expert witness’s basis for his diagnosis.” Grayson, 824 So.2d at 838. According to this Court’s holding in Grayson, the prosecutor’s questions were well within the permissible scope of cross-examination of an expert witness and did not constitute error.
B.
Second, Albarran asserts that it was error to allow the prosecutor to question Dr. Silva about whether he was aware that no cocaine had been found at the restaurant.
Dr. Silva stated in his report that Albar-ran had ingested cocaine “three times” before the shooting. The prosecutor then asked the following during cross-examination:
“[Prosecutor]: Now, let me ask you about cocaine though. Because in your report it’s there he had had cocaine three times that morning before the event. You recall all of that?
“[Dr. Silva]: Yes, of course.
“[Prosecutor]: Where did he have that cocaine?
“[Dr. Silva]: Where did he have it?
“[Prosecutor]: Yeah. Where was he when he was ingesting cocaine.
“[Dr. Silva]: He had it on his own person while he was ingesting it, of course. He had it. He had — he had supply.
“[Prosecutor]: Yeah. But where was he physically when he was ingesting cocaine, there at the restaurant?
“[Dr. Silva]: Yes.
“[Prosecutor]: Okay. Was it powder? Was he smoking cocaine? What does he say?
“[Dr. Silva]: No. I think he was — I think he was smoking it, but he was very unclear on that count.
“[Prosecutor]: Yeah. He was confused. Yeah.
“[Dr. Silva]: He was — it got kind of vague that way, right?
“[Prosecutor]: Okay. Because you know when Investigator Gray, when he *172 investigated it, he asked — he asked the wife, Laura Castrejon, ‘Any other drugs?’ She said, ‘No, just drinking.’
“[Dr. Silva]: Yes.
“[Prosecutor]: Or I withdraw that because I don’t know that he actually did say that so I withdraw that. All she reported though, he was drinking. They did ask his brother and his brother said, ‘No, he doesn’t do drugs.’
“[Defense counsel]: Which brother?
“[Prosecutor]: Jose.
“[Prosecutor]: And you’re also aware that when he was booked at the jail that night, he told the nurse at the jail, he filled out a sheet, and it said, ‘Any drugs?’ ‘No.’
“[Dr. Silva]: Yes. I’m aware of that.
[[Image here]]
“[Prosecutor]: Is it your professional opinion that he had ingested cocaine that day?
“[Dr. Silva]: Yes.
[[Image here]]
“[Prosecutor]: Do you also know that when the investigators conducted the investigation there, his person, his car, his restaurant, no evidence of cocaine anywhere?
“[Dr. Silva]: That’s right.”
(R. 3035-39.)
Given that Dr. Silva testified that it was his opinion that Albarran was on cocaine at the time of the shooting and that he had ingested cocaine three times while he was at the restaurant that day, the prosecutor was well within the broad scope of permissible cross-examination of an expert. That is, the prosecutor’s questions properly tested Dr. Silva’s knowledge of the facts underlying his opinion. See Grayson, 824 So.2d at 837 (holding that “[i]n order to test the credibility of an expert’s testimony, it is permissible for a challenging party to question the witness concerning the completeness and accuracy of his knowledge of the facts that formed the basis for his opinion”). Therefore, the prosecutor’s question did not amount to error, much less plain error.
C.
Albarran next argues that the circuit court erred in allowing the prosecutor to cross-examine Dr. Weinstein during the sentencing hearing about a previous case that he testified in as an expert in Colorado.
Dr. Weinstein testified that it was his opinion that Albarran was mildly mentally retarded. On cross-examination, the prosecutor questioned Dr. Weinstein about the frequency of his testimony in capital-murder cases and about specific capital-murder cases in which he had appeared as an expert. The prosecutor questioned him about an order issued by a judge in a Colorado ease he had testified in about three months before the trial in this case. (R. 4412.) Then, the following occurred:
“[Prosecutor]: ‘Dr. Weinstein has chosen the reverse and has abandoned scientific objectivity in order to reach the end he has chosen.’ Were you aware that Judge King had said that about you?
“[Defense counsel]: May I interpose this objection? I’m not objecting to the form of the question to the trial or where [the prosecutor’s] heading. But if he’s got a document that Mr. Weinstein hasn’t seen, could he show it to him and make sure that it’s in context and we would like to see it, too.
“[Prosecutor]: Sure.”
(R. 4415-16.) Defense counsel did not object to the prosecutor’s questioning Dr. Weinstein about his testimony in prior cases or to the Colorado court’s findings relating to Dr. Weinstein’s credibility. In *173 fact, counsel specifically said that he had no objection. Accordingly, this Court reviews this issue for plain error. See Rule 45A, Ala. R.App. P.
“The right to cross-examine a witness extends to any matter relevant to any issue and to matters affecting the credibility of the witness.... ” Rule 611(b), Ala. R. Evid.
“The credibility of a witness is always relevant and material. See, e.g., Mickle v. State, 226 Ala. 616, 617, 148 So. 319, 320 (1933) (‘Any fact tending to discredit the testimony of an adverse witness is always relevant and material.’). Rule 616, Ala. R. Evid., provides that ‘[a] party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party or the case or that the witness has an interest in the case.’”
Satterwhite v. City of Auburn, 945 So.2d 1076, 1089 (Ala.Crim.App.2006).
“It cannot be gainsaid that the prosecutor was vigorous and aggressive in his cross-examination of [the expert]; however, we are unable to conclude that the prosecutor’s cross-examination amounted to misconduct. The prosecutor’s questions included the number and types of cases in which she testified for defendants in death penalty cases, the thrust of her testimony, and her compensation in such cases. This line of questioning of opposing expert witnesses is standard fare and is not prohibited.”
Eaton v. State, 192 P.3d 36, 118 (Wyo.2008). “[A]n expert’s testimony in prior cases involving similar issues is a legitimate subject of cross-examination.” People v. Price, 1 Cal.4th 324, 457, 3 Cal.Rptr.2d 106, 184, 821 P.2d 610, 688 (1991). “The witness’s personal philosophical opposition to the death penalty is relevant to his credibility.” People v. Bennett, 45 Cal.4th 577, 606, 88 Cal.Rptr.3d 131, 156,
199 P.3d 535, 556 (2009). “Wide latitude is permitted in cross-examination to show bias or motive and the affect on a witness’s credibility.” Bennett v. State, 933 So.2d 930, 947 (Miss.2006). “The state had the right to question [the expert] about his role as a mitigation expert in other cases to establish a testimonial pattern and thus to expose a possible bias for or against the death penalty.” State v. Irish, 807 So.2d 208, 213-14 (La.2002). “We have in fact recognized a host of matters upon which cross-examining counsel may inquire in demonstration of bias, including, for instance, the frequency with which a defense expert testifies for capital defendants.” Rose v. State, 787 So.2d 786, 798 (Fla.2001).
It is clear that the prosecutor’s cross-examination was focused on determining the extent of Dr. Weinstein’s bias against capital punishment. “[T]he prosecutor’s questioning was not improper, but was designed to detect bias in [the expert] and thereby discredit his findings of mitigating evidence in favor of appellant.” State v. Ahmed, 103 Ohio St.3d 27, 48, 813 N.E.2d 637, 661 (2004).
VIII.
Albarran next argues that the circuit court erred in allowing the prosecutor to ask Albarran’s cousin, Obdulio Albar-ran, if he thought that Albarran was crazy.
During the cross-examination of Obdu-lio, the prosecutor asked: “You don’t think [Albarran]’s crazy, do you?” Obdulio responded: “No.” Sometime after the witness concluded his testimony, defense counsel moved to exclude Obdulio’s answer. The circuit court then stated the following:
“The Court: If you’re going to — if you wanted this tape in — there was a portion of this trial where you wanted certain *174 portions in because Laura says, ‘He’s loco,’ which means he’s crazy.
“[Defense counsel]: Right.
“The Court: Which means he’s crazy. It’s her opinion he’s crazy. That’s coming — I don’t see any distinction between that and them asking the witness on cross-examination if they believe someone’s crazy.
“So I think you have the right to follow up and clarify.... ”
(R. 2666.)
Rule 701, Ala. R. Evid., which became effective January 1,1996, states:
“If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
The Alabama Supreme Court in Ex parte Lee, 506 So.2d 301 (Ala.1987), stated:
“In Alabama, a lay witness may give his opinion on the question of a defendant’s sanity or insanity as long as the proper predicate has been laid. Williams v. State, 291 Ala. 213, 279 So.2d 478 (1973); Lokos v. State, 434 So.2d 818 (Ala.Crim.App.1982), affirmed, 434 So.2d 831 (Ala.1983); Carroll v. State, 370 So.2d 749 (Ala.Crim.App.), cert. denied, 370 So.2d 761 (Ala.1979). To lay a proper predicate for the admission of such an opinion, a witness must first have testified: (1) to facts showing that he had an adequate opportunity to observe such defendant’s conduct in general, and (2) to his personal observation of specific irrational conduct of the defendant. See Williams v. State, supra; Lokos v. State, supra; Carroll v. State, supra. See also C. Gamble, McElroy’s Alabama Evidence, § 128.02 (3d ed.1977). Of course, in making the determination as to whether the witness has had an adequate opportunity to observe such defendant’s conduct so as to render his opinion admissible, much is left to the sound legal discretion of the trial court. Williams v. State, supra.”
506 So.2d at 303. See also Simmons v. State, 675 So.2d 79 (Ala.Crim.App.1995); Flenory v. State, 588 So.2d 940 (Ala.Crim.App.1991); Ellis v. State, 570 So.2d 744 (Ala.Crim.App.1990).
Obdulio testified that he was Albarran’s cousin, that they grew up together, and that he worked with Albarran when Albar-ran lived in Tennessee. Obdulio testified on direct examination that Albarran was typically fine but that sometimes he would change and become very angry. He also testified that Albarran’s behavior changed after he married, that he became very jealous of anyone who had contact with his wife, and that he tried to keep people away from his wife. The prosecutor then asked Obdulio, “You don’t think [Albarran]’s crazy, do you?” Obdulio replied: “No.” (R. 2658.) A proper predicate was established for Obdulio’s testimony, and the testimony was correctly admitted into evidence. See Ball v. State, 337 So.2d 31, 36 (Ala.Crim.App.1976) (“Insanity is a defense which must be proved to the jury.... Inquiry during cross-examination touching upon the question of appellant’s sanity, is proper and testimony relating thereto is for the jury’s consideration.”).
IX.
Albarran argues that the circuit court erred in allowing several witnesses for the State to testify to what he asserts were Albarran’s mental operations, that their testimony amounted to “speculative opinion” concerning Albarran’s state of mind, and that it constituted inadmissible opinion testimony. Albarran challenges the testi *175 mony of three witnesses — Investigator David Mullins, Tanisha Thomas, and Tommy Joiner.
A.
First, Albarran argues that it was error to allow Investigator David Mullins of the Huntsville Police Department to testify that when he was transporting Al-barran to the police station immediately after he was arrested, Albarran had a “kind of flippant attitude like he didn’t care what was going on.” (R. 3195.)
The record shows that after Investigator Mullins made the statement, defense counsel objected and moved to exclude his testimony. The circuit court denied the motion. (R. 3195.)
“The courts have adhered to the wide latitude rule relating to the admissibility of the conduct and condition of a criminally accused offered in support of his plea of insanity. This wide latitude has encompassed many forms of conduct and conditions which the trial courts have held are relevant to show his mental incapacity at the time in issue. This same wide latitude has been exercised in the decisions relating to the admissibility of the conduct and condition of the accused offered by the state in opposition to the accused’s plea of insanity.”
Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 61.01(7) (6th ed.2009). “It is true that this court has held in a long line of cases that ‘wide latitude’ is allowed both the defendant and the State in inquiries into a person’s mental state when an issue as to the sanity of such a person is presented.” Watts v. State, 282 Ala. 245, 246, 210 So.2d 805, 807 (Ala.1968). As this Court stated in Tuck v. State, 384 So.2d 1240 (Ala.Crim.App.1980):
“The law in Alabama is clear that a witness may testify whether another person appeared to be mad or angry. Tagert v. State, 143 Ala. 88, 39 So. 293 (1905); Dozier v. State, Ala. Cr.App., 337 So.2d 148 (1976); Gamble, McElroy’s Alabama Evidence, § 127.01(3), (3d ed.1977). In Carney v. State, 79 Ala. 14 (1885), Chief Justice Stone wrote:
“‘Human emotions and human passions are not, in themselves, physical entities, susceptible of proof, as such. Like the atmosphere, the wind, and some acknowledged forces in nature, they are seen only in the effects they produce. Pleasure, pain, joy, sorrow, peace, restlessness, happiness, misery, friendship, enmity, anger, are of this class. So, tenderness, sympathy, rudeness, harshness, contempt, disgust, the outcrop of emotional status, can not, in their constitution, be made so far physical facts, or entities, as to become the subject of intelligible word description. They are proved by what is called opinion evidence. Not the mere unreasoning opinion, or arbitrary conclusion of the witness, but his opinion based on experience and observation of the conduct, conversation, and facial expression of others, in similar emotional conditions. Facial expression and vocal intonation are so legible, as that brutes comprehend them; and yet human language has no terms by which they can be dissected, and explained in detail. The reasoning in such cases is a posteriori, and the major proposition is but the sum or resultant of every one’s experience and observation....”
384 So.2d at 1242. “‘Witnesses may always be allowed to testify as to the appearance and emotions of other persons.’ ” Renfroe v. State, 382 So.2d 627, 631 (Ala.Crim.App.1980) (quoting Hamilton v. State, 281 Ala. 448, 203 So.2d 684 (1967)). See McMorris v. State, 394 So.2d 392 (Ala. *176 Crim.App.1980) (witness allowed to testify that victim was in a “highly emotional state, upset, and disoriented”); Beard v. State, 337 So.2d 1372, 1376 (Ala.Crim.App.1976) (police officer allowed to testify that appellant “appeared rational, spoke clearly and distinctly and appeared mad”).
Here, Investigator Mullins’s testimony regarding Albarran’s appearance and apparent emotions was relevant to Albarran’s guilt and his insanity defense. Accordingly, the circuit court committed no error in allowing Investigator Mullins to testify concerning Albarran’s appearance immediately after the shooting. Renfroe, 382 So.2d at 631.
B.
Second, Albarran asserts that the circuit court erred in allowing Tanisha Thomas, an eyewitness to the shooting, to testify that when Albarran was shooting he was jumping around like he enjoyed it.
The record shows that defense counsel objected and moved for a curative instruction. The circuit court gave the following instruction: “[J]ust a moment ago the witness testified that it was her opinion that the Defendant appeared to enjoy himself as in regard to a certain act. It’s the instruction of this Court that you are to disregard that statement.” (R. 2039.)
“ ‘There is a prima facie presumption against error where the trial court immediately charges the jury to disregard the improper remarks or answers.’” St. John v. State, 523 So.2d 521, 524 (Ala.Crim.App.1987), quoting Wadsworth v. State, 439 So.2d 790 (Ala.Crim.App.1983). “The prejudicial effect of the comment was, therefore, cured.... ” Grace v. State, 431 So.2d 1331, 1335 (Ala.Crim.App.1982). Because the circuit court instructed the jury to disregard Thomas’s statement, this Court finds that any error was cured at trial. Therefore, Albarran is not entitled to any relief based on this issue.
C.
Third, Albarran asserts that the circuit court erred in allowing Tommy Joiner, an eyewitness, to testify that Al-barran was being “willfully nonresponsive” when he failed to comply with the police officers’ commands to get down on the ground. Specifically, Albarran asserts that Joiner’s testimony improperly conveyed Joiner’s opinion regarding Albar-ran’s undisclosed mental operations around the time of the shooting.
Albarran bases his argument on the following portion of the trial transcript:
“[Prosecutor]: Well, what happened next?
“[Tommy Joiner]: The next thing you know I seen a cop just sort of start slowly moving in. And he just grabbed him and put him to the ground, handcuffed him, and got him in the car. And one of the officers come over there and was like, you know, ‘What was we supposed to do?’ He was like nonrespon-sive. And I was like, ‘Well, he come up to me and asked me [for a cigarette] in English.’ I mean, ‘So he understands.’
“[Defense counsel]: I’m going to move to exclude that because what he understood about a cigarette doesn’t mean he understands in general.
“The Court: Well, that’s the statement. Did you make that statement? Did you say that?
“[Tommy Joiner]: I said that to an officer that was standing there.”
(R. 1987-88.)
Contrary to Albarran’s assertion, it does not appear that Joiner testified regarding his opinion of Albarran’s mental operation. Instead, Joiner was simply testifying as to a conversation he had had with one of the *177 police officers at the scene. Further, testimony indicating that Albarran appeared to be nonresponsive to police officers’ commands was admissible. Renfroe v. State, 382 So.2d 627, 631 (Ala.Crim.App.1980) (“ ‘Witnesses may always be allowed to testify as to the appearance and emotions of other persons.’ ”) (quoting Hamilton v. State, 281 Ala. 448, 203 So.2d 684 (1967)). Therefore, the circuit court did not commit any error in allowing Joiner’s testimony regarding Albarran’s apparent unresponsiveness to the officers’ commands.
X.
Albarran next argues that the circuit court erred in allowing Chad Steele to testify regarding his opinion of what the screams he heard from Officer Golden resembled.
The record shows that Steele was asked if he was able to hear screams for help. Steele replied that “[i]t sounded like a dog when it was getting wounded.” (R. 2169.) Albarran moved to exclude Steele’s answer. The circuit court denied the motion, stating that it was Steele’s opinion about what he had heard and that it was admissible.
“A witness may characterize a sound, including as to the noise level of the sound, or state the cause.... A witness may also characterize a sound by stating that it had a resemblance to other sounds.... ” 32 C.J.S. Evidence § 780 (2010).
“As an exception to the general rule prohibiting the introduction of nonexpert opinion evidence, lay witnesses are allowed to express their opinions when it is impractical for them to detail the facts or otherwise reproduce the data upon which the opinion is based in such a way as to enable the jury to comprehend what the witness observed. This exception is almost uniformly applied where the opinion in question relates to visibility, audibility, redolence, or the like, the courts taking the view that such matters cannot be adequately conveyed to the jury in any form but opinion, and thus holding the opinion admissible.”
Comment Note, Ability to See, Hear, Smell, or Otherwise Sense, as Proper Subject of Opinion by Lay Witness, 10 A.L.R.3d 258 (1966).
Here, Steele’s testimony regarding what Officer Golden’s screams resembled after he was shot and was begging for his life was admissible. Further, this Court has reviewed Steele’s testimony and holds that the probative value of Steele’s testimony was not outweighed by any prejudice. Rule 403, Ala. R. Evid. Therefore, the circuit court committed no error in denying Albarran’s motion to exclude Steele’s testimony.
XI.
Albarran next argues that the circuit court erred in allowing the jurors to submit proposed questions to the witnesses.
The record shows that the circuit court allowed the jurors to submit proposed questions to the -witnesses and indicated that not all the questions could be answered. The court stated for the record that it would examine the questions with all the attorneys, that it would not allow a question to be asked of the witness unless both parties agreed to the question, and that it would instruct the jury “to take nothing from the fact that any question was not answered.” (R. 2369.) The questions ranged from “Was the front door [of the restaurant] tinted as dark as it is today?”[5] to “Have you [Dr. Hooper] ever *178 treated any patients with a cocaine induced psychosis?”
In his brief, Albarran specifically challenges questions that the jury formulated to ask Dr. Hooper, the State’s mental-health expert. At the conclusion of Dr. Hooper’s testimony, the court asked the following questions posed by the jury:
“The Court: Have you ever treated— Dr. Hooper, have you ever treated any patients with a cocaine induced psychosis?
“[Dr. Hooper]; Yes, ma’am. Dozens of times.
“The Court: How many?
“[Dr. Hooper]: At least 30 or 40.
“The Court: Were any of them calm and/or logical?
“[Dr. Hooper]: No, ma’am. None of them.”
(R. 3375.) Albarran did not object when Dr. Hooper was asked these questions. The questions appear to be an expansion of questions asked Dr. Hooper on direct examination. During direct examination, Dr. Hooper testified: “I’ve seen lots and lots of people who have had a cocaine induced psychosis”; he also testified that it would be very unlikely that a person in a cocaine-induced psychosis would be calm and logical. (R. 3267.)
The Alabama Supreme Court in Ex parte Malone, 12 So.3d 60 (Ala.2008), addressed the validity of the circuit court’s allowing jurors to submit questions to witnesses. The Supreme Court stated:
“A substantial number of state courts in other jurisdictions have considered the issue whether jurors may question witnesses. They have overwhelmingly held that the practice is not error per se. Moreover, ‘every [federal] circuit to consider the practice has permitted it, holding that the decision to allow juror questioning rests within the discretion of the trial judge.’ United States v. Richardson, 233 F.3d 1285, 1289 (11th Cir.2000). ‘Allowing jurors to ask witnesses questions is “neither radical nor a recent innovation.” State v. Doleszny, 176 Vt. 203, [211,] 844 A.2d 773, [780] (2004). It is a practice with “deeply entrenched” roots in the common law. United States v. Bush, 47 F.3d 511, 515 (2nd Cir.1995).’ Medina v. People, 114 P.3d 845, 851 (Colo.2005). ‘American courts have long sanctioned the practice.’ United States v. Bush, 47 F.3d 511, 515 (2nd Cir.1995).
“The jury’s role in a trial is to ‘ “ ‘assure a fair and equitable resolution of factual issues.’ ” ’ Richardson, 233 F.3d at 1289 (quoting Standard Oil Co. of California v. Arizona, 738 F.2d 1021, 1031 (9th Cir.1984), quoting in turn Colgrove v. Battin, 413 U.S. 149, 157, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973)). Allowing jurors to question witnesses can ‘serve to advance the search for truth by alleviating uncertainties in the jurors’ minds, clearing up confusion, or alerting the attorneys to points that bear further elaboration.’ United States v. Sutton, 970 F.2d 1001, 1005 n. 3 (1st Cir.1992). Juror questioning can also lead to ‘more attentive jurors and thereby leads to a more informed verdict.’ Richardson, 233 F.3d at 1290 (citing Larry Heuer & Steven Penrod, Increasing Juror Participation in Trials: A Field Experiment with Jury Notetaking and Question Asking, 12 Law and Hum. Behav. 231, 233-34 (1988)). Proper communication is necessary for a jury to correctly fulfill its fact-finding duty and ‘there is reason to believe that permitting receivers of information, e.g., jurors, to ask questions enhances not only their ability to understand what is being communi *179 cated, but results in their putting forth more effort to listen and to understand because they know they may ask questions.’ Yeager v. Greene, 502 A.2d 980, 999-1000 (D.C.1985).
[[Image here]]
“We agree with the majority position that allowing jurors to question witnesses is not error per se on the part of the trial court. For the same reasons the aforementioned jurisdictions have upheld the practice, we hold that it is within the discretion of the trial court to allow jurors to question a witness.
“Malone argues that the trial court here erred when it went beyond merely allowing jurors to ask questions of the witnesses and actively solicited questions from the jurors. In United States v. Ajmal, 67 F.3d 12, 15 (2d Cir.1995), the United States Court of Appeals for the Second Circuit held that the trial court exceeded its discretion by allowing extensive juror questioning as a matter of course and by inviting questions at the end of each witness’s testimony. That court stated that the trial court’s decision to invite and allow extensive juror questioning was not ‘necessitated by the factual intricacies of [that case].’ Ajmal, 67 F.3d at 14. It also noted that it considered the practice of juror questioning an allowable but disfavored practice.
“In contrast, the Supreme Court of Utah, in a case in which the trial judge invited jurors to ask questions at the end of each witness’s testimony, held:
“ ‘The fact that the trial court granted the jurors permission to ask questions of witnesses without any special request from them for this privilege does not, in our opinion, in and of itself constitute error. The determining factors as to whether error has been committed is the type of questions asked and allowed to be answered. If the questions asked are not germane to the issues involved or are such as would be clearly improper and therefore prejudicial to the rights of the defendants to a fair and impartial trial, the court’s allowing them to be answered would be error.’
“State v. Anderson, 108 Utah 130, 133, 158 P.2d 127, 128 (1945).
“We agree with the Utah Supreme Court that soliciting questions from jurors is not error per se, but that whether the trial court has exceeded its discretion in so doing is determined by the type of questions the trial judge allows and whether those questions are prejudicial to the defendant’s rights. However, we also agree with the Second Circuit Court of Appeals that the practice should be disfavored and that a trial court should not promote or encourage the practice because it risks ‘altering the role of the jury from neutral fact-finder to inquisitor and advocate.’ Ajmal, 67 F.3d at 15.”
12 So.3d at 63-66. See also Annot., Propriety of Jurors Asking Questions in Open Court During Course of Trial, 31 A.L.R.3d 872 (1970); Note, The Current Debate on Juror Questions: “To Ask or Not to Ask, That is the Question,” 78 Chi-Kent L.Rev. 1099 (2003); Note, Breaking the Silence: Should Jurors Be Allowed to Question Witnesses During Trial?, 44 Vand. L.Rev. 117 (1991); Note, Juror Questions A Survey of Theory and Use, 55 Mo. L.Rev. 817 (1990).
Thus, according to Malone, this Court must examine the type of questions asked and whether the questions were prejudicial to the defendant’s rights. The majority of the questions dealt with matters that had already been addressed on direct examination or on cross-examination. As stated above, the questions ranged from “Was the *180 front door [of the restaurant] tinted as dark as it is today?” to “Have you [Dr. Hooper] ever treated a patient with a cocaine induced psychosis?” The circuit court did not allow a great many of the questions to be asked. This Court has reviewed all the questions that were submitted and those the court allowed to be asked of the witnesses and finds no prejudice to Albarran. Accordingly, this Court holds that no error occurred when the circuit court allowed the jury to submit questions to witnesses. See Malone, 12 So.3d at 63-66.
XII.
Albarran next argues that his constitutional rights were violated because Alabama lacks a certification procedure for foreign-language interpreters and because the court’s interpreter made “critical errors when translating the testimony of the Mexican Spanish-speaking defense witnesses into English.” (Albarran’s brief, at 124.)
Before trial, the circuit court swore Patrick Castle in as the court’s interpreter and administered the following oath:
“Do you solemnly swear or affirm that you will interpret accurately, completely and impartially using your best skill and judgment in accordance with the standards proscribed by law, follow all official guidelines established by this Court for legal interpreting and translating, and discharge all of the solemn duties and obligations of legal interpretation and translation?”
Castle responded: “I do.” (R. 342.)
Another interpreter, Dara Fernandez Perez, was later sworn in as the court’s interpreter. Perez was recommended to the court by Castle. Perez indicated that she was from Spain, that she was in her third year of law school, that she had been interpreting for several years, and that she had acted as an interpreter in numerous legal proceedings. (R. 1920.) Perez was examined by the court and stated:
“Although I am from Spain and, for those of you who know, the slang or the vocabulary that we use in Spain is very different from that used in Mexico. However, in — since I came to the United States because of the demographics of the population, both in Minnesota where I was residing prior to Birmingham and also in Birmingham, Alabama, the demographics of the population is largely Mexican. So in my professional experience for the last eight years now that I’ve been working exclusively with the Latino population, that’s the dialect that I’ve been forced to utilize. And so I feel comfortable with the Mexican terminology”
(R. 1923-24.) Perez then met with the defense mitigation specialist and a member of Albarran’s family to see if she could understand the dialect of the remote area where the witnesses were from in Mexico. After this meeting, Perez testified: “I would say it was fine and smooth. I think we agreed on asking for clarifications if there was a time where a term was not known to me or if a term wasn’t appropriately explained.” (R. 1932.) The defense appeared satisfied with Perez. Counsel’s only objection was the lack of a certification procedure in Alabama. The court then gave Perez the same oath that was administered to Castle. (R. 1936.)
While Albarran objected to the lack of a certification procedure in Alabama, he did not object to any of Perez’s interpretations.
In Alabama, § 15-1-3, Ala.Code 1975, addresses the use of foreign-language interpreters, and it states, in pertinent part:
“(a)(1) If at any stage of a criminal or juvenile proceeding the defendant, juve *181 nile, or a witness informs the court that he or she does not speak or understand the English language, the court may appoint an interpreter.
[[Image here]]
“(b) Upon appointment, an interpreter shall swear under oath that he or she will render a true and clear interpretation to the best of his or her skill and judgment.”
Alabama has no statute that requires that a court interpreter be certified. “Although the use of court-certified interpreters is mandated by statute in federal criminal proceedings, the Supreme Court has not held that the use of court-certified interpreters is a constitutional requirement.” Singh v. Curry, 689 F.Supp.2d 1250, 1263 (E.D.Cal.2010) (footnotes omitted). “There is no requirement that interpreters be certified.... The need for certification is a matter for the legislature to address.” State v. Her, 510 N.W.2d 218, 223 n. 2 (Minn.Ct.App.1994). “In People v. Estrada, 176 Cal.App.3d 410, 221 Cal.Rptr. 922, 924 (1986), the court recognized a defendant’s constitutional right to an interpreter means a competent interpreter, not necessarily a certified interpreter.” State v. Pham, 75 Wash.App. 626, 633, 879 P.2d 321, 326 (1994).
“[I]t has been stated unequivocally that ‘rulings on the appointment and qualifications of interpreters do not reach constitutional proportions. See Fairbanks v. Cowan, 6 Cir. 551 F.2d 97, 99. Whatever problems there may be with the testimony of [an interpreter] go to the sufficiency of the evidence.’ (Emphasis added) Soap v. Carter, 632 F.2d 872, 874-75 (10th Cir.1980), cert. denied, 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981).”
Commonwealth v. Carrillo, 319 Pa.Super. 115, 130-31, 465 A.2d 1256, 1264 (1983). See Thomas M. Fleming, Annot., Right of Accused to Have Evidence or Court Proceedings Interpreted, Because Accused or Other Participant in Proceedings is not Proficient in the Language Used, 32 A.L.R.5th 149 (1995).
Albarran’s constitutional rights were not violated because Alabama has no certification procedure for court interpreters. See Pham, supra. “The qualifications of an interpreter are determined by the trial judge, and his determination will not be overturned in the absence of an abuse of discretion.” Fairbanks v. Cowan, 551 F.2d 97, 99 (6th Cir.1977). Accordingly, Albarran is not entitle to any relief based on this issue.
To the extent Albarran asserts that the interpreter made mistakes in her translation, Albarran failed to object at trial. Therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P. This Court has reviewed the record and finds that any alleged misinterpretations did not rise to the level of plain error. The record establishes that the non-English speaking witnesses’ testimony, although somewhat confusing at times, conveyed the information intended to be conveyed. Accordingly, this Court holds that any alleged errors in the interpretation was not prejudicial and does not rise to the level of plain error.
XIII.
Albarran next argues that the prosecutor engaged in misconduct that denied him his right to a fair trial. Specifically, he asserts that the prosecutor misstated the law, characterized the defendant in “opprobrious terms,” based his closing argument on personal knowledge, and made inflammatory remarks that undermined Albar-ran’s presumption of innocence.
Albarran did not object to any of the now challenged instances of prose- *182 cutorial misconduct. Accordingly, this Court reviews these claims for plain error. See Rule 45A, Ala. RApp. P.
“ “While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ] (emphasis in original). ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).”
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990) (emphasis omitted).
“In judging a prosecutor’s closing argument, the standard is whether the argument ‘ “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).
“ ‘In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).’
“Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). Finally,
“ ‘ “[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.” Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). “In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,” Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). “In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.” Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). “To justify reversal *183 because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.” Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).’
“Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).”
Sneed v. State, 1 So.3d 104, 138-39 (Ala.Crim.App.2007).
A.
First, Albarran argues that the prosecutor misstated the law concerning mental disease or defect when he made the following argument during closing in the guilt phase:
“What does the law mean when they talk about a severe mental disease or defect? They’re talking about the people who are — who are picking bugs off their skin. And they’re — and that’s real. Unfortunately some people are that way.
[[Image here]]
“Now if you take that whole standard of suffering from a severe mental disease or defect and unable to appreciate the nature and quality of wrongfulness of your actions, what do you- envision? I envision somebody out of their mind out there on the scene. I envision somebody in his shoes when the officers roll up saying, T killed the Devil.’ That’s a guy who doesn’t appreciate the nature or quality of wrongfulness.
“It’s not the guy who’s over there smoking a cigarette. It’s not the guy who talks to Charlie Gray and says to Charlie, T didn’t do it.’ I didn’t do it? You think that’s appreciating right from wrong? I would say so.
“You know, if you had a guy — if you had a guy who is howling at the moon with a gun in his hand talking about the Devil, at least you are in the game for an insanity defense. They’re not close on this case.”
(R. 3651-56.)
The circuit court gave the following instruction during the guilt-phase instructions:
“An attorney’s statements and arguments are intended to help you understand the evidence and apply the law. The statements and arguments of attorneys, however, are not evidence. You should therefore disregard any remark, statement, or argument which is not supported by the evidence or by the law as given to you by this Court.”
(R. 3670-71.)
“[P]rosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So.2d 961 (Ala.Cr.App.1982). ‘Statements of counsel and argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors is the formation of the verdict.’ Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984).”
Armstrong v. State, 516 So.2d 806, 809 (Ala.Crim.App.1986).
Viewed as a whole, the prosecutor’s argument conveyed the message that Albar-ran’s actions after the murder were inconsistent with insanity. This argument was well within the wide range of permissible comment during closing arguments and did not result in such unfairness as to constitute a denial of due process. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Therefore, this Court holds that no error, much less plain error, resulted from the prosecutor’s comment.
B.
Second, Albarran argues that the prosecutor characterized him in “opprobrious terms” when he referred to him as *184 “cold-blooded,” “evil,” “dark-hearted,” and “heartless.”
“ ‘[T]he prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.’ ” Henderson v. State, 584 So.2d 841, 857 (Ala.Crim.App.1988) (quoting Nicks v. State, 521 So.2d 1018, 1023 (Ala.Crim.App.1987)). In Nicks v. State, this Court stated:
“There is a multitude of reported cases concerning derogatory characterization of an accused by a prosecuting attorney in closing arguments. Examples of such cases can be found in Watson v. State, 266 Ala. 41, 44, 93 So.2d 750, 752 (1957); Barbee v. State, 395 So.2d 1128, 1134 (Ala.Cr.App.1981); and the Alabama Digest. The general rule pertaining to such comments is set out in 23A C.J.S. Criminal Law § 1102 (1961), as follows:
“ ‘Comments by the prosecuting attorney which refer to, and make unfavorable inferences from, the conduct of accused in the course of the transaction for which he is on trial, or his conduct at any other time or place, or which refer to his character as shown by such conduct, or to his background, breeding, or associations, or to other details of his personal history or characteristics are proper, where the pur- • ported facts referred to by counsel are supported by competent evidence in the case, and where the inferences and deductions sought to be made from such facts are within the bounds of proper argument. On the other hand, remarks or argument of the prosecuting attorney concerning the character or conduct of accused, which is not supported by the record or which exceeds the limits of fair argument or inference is improper.
“ ‘In a proper case, the prosecuting attorney may characterize accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence in the case, and, where the evidence warrants the belief that accused is guilty, the prosecutor may employ terms appropriate to the nature or degree of turpitude involved in the crime charged; but characterizations not justified by the evidence or the charge which the evidence tends to prove and hence merely abusive, or which are couched in intemperate and inflammatory language are ... improper.’ ”
521 So.2d at 1022-23 (footnotes omitted). See Melson v. State, 775 So.2d 857, 889 (Ala.Crim.App.1999) (prosecutor referred to defendant as “cold-blooded murderer”); Kinard v. State, 495 So.2d 705, 711 (Ala.Crim.App.1986) (prosecutor referred to defendant as “an unmitigated liar and murderer”).
Here, the terms that the prosecutor used to describe Albarran were consistent with the evidence presented in the case. The evidence indicated that Albarran shot and murdered a law-enforcement officer while that officer begged for his life. Thus, the evidence indicated that Albar-ran’s actions were “cold-blooded,” “evil,” “dark-hearted,” and “heartless.” Accordingly, no error resulted from the prosecutor’s characterization of Albarran.
C.
Third, Albarran argues that the prosecutor erred in making arguments that were based on his personal knowledge. Specifically, he references arguments that were made in the State’s rebuttal closing argument in the guilt phase.
*185 The prosecutor first argued in rebuttal that defense counsel had challenged the testimony of the eyewitnesses to the shooting. The prosecutor then argued:
“Now, has Tanisha Thomas told the exact word for word same statement every time? I’m sure she hasn’t. I’m sure she hasn’t. And there may be some periphery items that blur in her mind. There may be. But as far as the core of what happened, I’ve never had a witness that was really self-validated by her 911 tape. I absolutely have not.”
(R. 3633) (emphasis added.)
This Court has held that “[a]ttor-neys, particularly prosecutors, should be careful in arguments to the jury to refrain from injecting their own personal belief, experience, or knowledge in support of an argument....” Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989).
“Although it is never proper for a prosecutor to state his or her personal opinion regarding the ultimate issue to be decided by the jury, we cannot say that the prosecutor’s comment in this case so infected the trial with unfairness that [the defendant] was denied due process. See Darden v. Wainwright, 477 U.S. 168 (1986).”
Smith v. State, [Ms. CR-97-1258, August 31, 2007] _ So.3d _, _( Ala.Crim.App.2007). See also Ex parte Sharp, [Ms. 1080959, December 4, 2009] _ So.3d _, _ (Ala.2009).
Here, the prosecutor’s comment did not infect the trial with unfairness so as to deny Albarran due process. Smith, — So.3d at —. The prosecutor’s comment merely informed the jury of what it should have already known, i.e., that witnesses’ memories of details fade over time. The prosecutor did not imply that there was unpresented evidence that the jury would consider, nor did his comment urge the jury to abandon its role as the fact-finder and rely on the prosecutor. Accordingly, this Court holds that the prosecutor’s comment did not rise to the level of plain error. Rule 45A, Ala. R.App. P.
D.
Fourth, Albarran argues that the prosecutor improperly undermined the presumption of his innocence by stating during closing argument that Albarran’s lawyers had given him an “impressive defense” that “I don’t know that he deserves.”
In the State’s rebuttal closing argument, the prosecutor argued the following:
“Let me tell you what their defense is. Their defense is please do not convict him of capital murder. Whatever you do, do not convict him of capital murder. And for them to get there they want to get you scattered in all kind of directions. That’s their tactic. That’s what they’re doing. And when I say that, I know Richard and Derek and Bruce, they don’t take it personally that I’m saying that because these are fine lawyers. They really are. And they have given this man a defense that, frankly, is impressive. I don’t know that he deserves it, but under our system I’m glad it’s happened.”
(R. 3625.)
This comment was not so egregious that it denied Albarran a fair trial. See Darden v. Wainwright, supra. See also People v. Whitehurst, 70 A.D.3d 1057, 895 N.Y.S.2d 523 (2010) (comment by prosecutor that defendant did not deserve the jury’s sympathy was improper but harmless); Young v. State, 12 P.3d 20, 45-46 (Okla.Crim.App.2000) (comment that the appellant did not “deserve to lie in a ‘prison environment, not have to go to work every day, get his meals prepared, have a *186 nice clean place to live’ while his victim ‘lies dead in his grave’ ” was error but did not “affect the fundamental fairness of the proceeding”); Johnson v. Zant, 249 Ga. 812, 818, 295 S.E.2d 63, 69 (1982) (“This court has held that flight of oratory, figurative speech, and false logic are not error requiring reversal.... These may include closing argument by the district attorney characterizing a defendant as a ‘brute, beast, an animal and a mad dog who did not deserve to live.’ ”). Here, the prosecutor did not undermine Albarran’s presumption of innocence; instead, the prosecutor, inartfully, praised defense counsel and the impressive defense that counsel had presented. Accordingly, this Court holds that the prosecutor’s comment did not rise to the level of plain error. Rule 45A. Ala. R.App. P.
XIV.
Albarran next challenges several jury instructions given by the circuit court in the guilt phase of his trial.
“When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.” Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000) (citing Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999)).
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
Williams v. State, 795 So.2d 753, 780 (Ala. Crim.App.1999).
Moreover,
“ ‘In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that “an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.” Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).’ ”
Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000) (quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998)).
With these principles in mind, this Court will now turn to Albarran’s arguments concerning the circuit court’s jury instructions.
A.
First, Albarran argues that the circuit court undermined his defense and confused the jury by instructing it that “voluntary intoxication in and of itself is not a severe mental disease or defect.” (R. 3702); (emphasis added.)
After the circuit court charged the jury, defense counsel objected to the above instruction. (R. 3714-15.) The prosecutor then argued:
“Based on the facts of this case the State’s response is that — well, there isn’t any evidence that the intoxication *187 rose to the level of a mental disease or a defect or a severe mental disease or defect. Severe being the operative word and really the only purpose for this particular objection and this particular instruction. We’ve already gotten the instruction on intoxication as negating intent. This particular instruction is going to offer even more confusion into the issue of mental state or mental disease or defect....”
(R. 3715-16.) The defense then argued that the court’s instruction failed to contain the word “severe” mental disease. The court’s instruction, however, did state “severe mental disease or defect.”
The circuit court instructed the jury on voluntary intoxication and on manslaughter, and instructed the jury that intoxication was relevant to negate an element of an offense such as intent, and that “voluntary intoxication is not a defense to a criminal charge unless it rises to the level of insanity.” (R. 3686.) The court instructed the jury on the lesser offenses of reckless murder, provocation murder, and manslaughter. The following instruction was then given:
“[I]f you find that the State has proven beyond a reasonable doubt all of the elements of one of the offenses or crimes that I just explained to you, you must then determine whether Benito Albar-ran has proven by clear and convincing evidence that he was legally insane or suffering from a severe mental disease or defect at the time the offense was committed. Insanity which will excuse a crime under the law of this state must be the result of a severe mental disease or defect....
“For you to find the Defendant not guilty by reason of insanity or severe mental disease or defect, you must be convinced that Benito Albarran has proven to each of you the following elements by clear and convincing evidence to your reasonable satisfaction and there are two. That at the time of the crime Benito Albarran suffered from a severe mental disease or defect and that as a result of such severe mental disease or defect he was unable to appreciate the nature and quality of his act or was unable to appreciate the wrongfulness of his acts.
“Clear and convincing evidence is evidence that makes it highly probable that Benito Albarran had a severe mental disease or defect that prevented him from understanding the nature and quality of his acts or unable to appreciate the wrongfulness of his acts.
“In determining whether Benito Al-barran is legally responsible for his conduct, you must consider his mental condition at the time of the offense and not his current condition. Accordingly, you are instructed not to consider Benito Albarran’s appearance and demeanor or . to speculate concerning his present mental condition since those issues are not relevant in determining his mental condition on August 29, 2005.
“I also need to instruct you that under the laws of this state voluntary intoxication in and of itself is not a severe mental disease or defect.”
(R. 3700-02.)
Section 13A-3-2, Ala.Code 1975, specifically provides: “Intoxication in itself does not constitute mental disease or defect within the meaning of § 13A-3-1.” Section 13A-3-1(a), Ala.Code 1975, provides: “It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts.” “Voluntary intoxication ‘is not a defense to a criminal *188 charge,’ § 13A-3-2(a), nor does intoxication in and of itself ‘constitute mental disease or defect within the meaning of § 13A-3-1,’ § 13A-3-2(d).” Ware v. State, 584 So.2d 939, 946 (Ala.Crim.App.1991) (footnote omitted). “ ‘[A] trial court has broad discretion in fashioning a jury instruction, provided it accurately reflects the law and facts of the case.’ ” Flowers v. State, 922 So.2d 938, 954 (Ala.Crim.App.2005) (quoting Raper v. State, 584 So.2d 544, 545 (Ala.Crim.App.1991)).
Because voluntary intoxication does not constitute a severe mental disease or defect for insanity purposes, the circuit court’s instructions to that effect were proper. Accordingly, the circuit court committed no error in instructing the jury that voluntary intoxication does not constitute a severe mental disease or defect.
B.
Albarran next argues that the circuit court improperly restricted the jury’s consideration of evidence of Albarran’s mental state at the time of the murder by refusing to instruct the jury that it could specifically consider observational evidence of Albarran’s mental illness when evaluating whether Albarran possessed the requisite mens rea for capital murder. To support his argument, Albarran relies on the United States Supreme Court’s decision in Clark v. Arizona, 548 U.S. 735, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006).
In Clark v. Arizona, the United States Supreme Court discussed the three types of evidence that are relevant to the issue of mens rea: (1) observational evidence, which concerns the defendant’s conduct that is witnessed by others; (2) mental-disease evidence in the form of opinion testimony; and (3) “capacity evidence” about “a defendant’s capacity for cognition and moral judgment....” 548 U.S. at 758. The United States Supreme Court in Clark did not hold that a defendant was entitled to jury instructions on each of the three categories of evidence related to mens rea.
Here, the following discussion occurred at the charge conference:
“[Defense counsel]: Well, the only thing — I’m not trying to add more argument. All I’m saying is that I do think that we should be able to well, first of all, we’ve given a lot of different considerations that I think are in line with Clark and the Alabama statutes on intoxication with respect to the capital charge. And we just want to make sure that we’re not going to be, you know, in anyway [sic] restricted from arguing our case in light of the Supreme Court decision in Clark v. Arizona.
[[Image here]]
“The court: All right. Duly noted. And I do not — most certainly I think that as it related to observational evidence that’s fíne.
“[Defense counsel]: Right. Okay.”
(R. 3481-83.)
Clearly, the circuit court complied , with Clark and allowed the defense to present “observational evidence” of Albarran’s mental state. Further, the circuit court’s failure to instruct the jury to consider observational evidence did not prevent the jury’s considering such evidence. Therefore, Albarran is not entitled to any relief based on this issue.
C.
Next, Albarran argues that the circuit court erred in instructing the jury that “unusual or weird behavior alone cannot be equated with mental incapacity or insanity.”
After the instructions were given, counsel noted that the court had given examples of “emotional, unusual, weird, or bi *189 zarre behavior” that would not necessarily be insanity. Counsel then stated that “we’re not necessarily saying that those things aren’t.” (R. 8716-17.) The circuit court then noted that it had taken the instruction from the pattern jury instructions. Counsel did not object to the examples given in the court’s instructions; therefore, this Court reviews this claim for plain error. See Rule 45A, Ala. R.App. P.
The circuit court gave the following instruction:
“Finally, as it relates to this particular issue, the law is that emotional insanity or temporary mania not associated with a disease of the mind does not constitute insanity. Where one does not act under the duress of a diseased mind or insane delusion but from motives of anger, revenge, or other passion, he cannot claim to be shielded from the punishment of a crime on the ground of insanity. High temper, hot blood and passion arising from anger, hatred, jealousy, desire for revenge or other emotions will not excuse the commission of crime. Unusual or weird behavior alone cannot be equated with mental incapacity or insanity. Whether or not the defendant was suffering from a severe mental disease or defect is for you, the jury, to determine from all of the evidence presented to you.”
(R. 3708.) Initially, this Court notes that the circuit court’s instruction was consistent with the pattern jury instruction.[6]
Moreover, “[a] ‘ “[s]evere mental disease or defect” does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.’ [§ 13A-3-1, Ala.Code 1975.] ‘Unusual or weird behavior alone cannot be equated with ... insanity.’ ” McFarland v. State, 581 So.2d 1249, 1254 (Ala.Crim.App.1991).
“ ‘[A] belief in witchcraft does not make one insane, just as belief in other faiths and religions [or cults] which deal in mysticism and rituals does not per se make one insane.’ McCord v. State, 507 So.2d 1030, 1032 (Ala.Cr.App.1987). ‘Unusual or weird behavior alone cannot be equated with mental insanity.’ Meredith v. State, 370 So.2d 1075, 1078 (Ala.Cr.App.) cert. denied, 370 So.2d 1079 (Ala.1979).”
Moss v. State, 536 So.2d 129, 135 (Ala.Crim.App.1988), rev’d on other grounds, Ex parte Gentry, 689 So.2d 916 (Ala.1996).
“Legal insanity does not embrace every kind of mental disease and disorder that renders a person not responsible for his acts. Waters v. State, 22 Ala.App. 644, 646, 119 So. 248 (1928). ‘Emotional insanity or moral obliquity will not sustain plea of insanity.’ Rowe v. State, 243 Ala. 618, 624, 11 So.2d 749 (1943). Moral obliquity ‘has no recognition in the law of this state as an excuse for crime.’ Hall v. State, 208 Ala. 199, 200, 94 So. 59 (1922). ‘(T)hat which is sometimes called “moral”, or “emotional insanity”, savors too much of a seared conscience or atrocious wickedness to be entertained as a legal defense.’ Boswell v. State, 63 Ala. 307, 321 (1879). ‘Moral idiocy’ does not qualify under the defense of insanity. Clayton v. State, 45 Ala.App. 127, 131, 226 So.2d 671 (1969).
“ Where by “moral insanity” is meant a mere mental depravity, or moral insanity, so-called, which results not from any disease of the mind, but from a perverted condition of the moral system, where the person is mentally sane, this does not exempt one from *190 responsibility for crimes committed under its influence.’ 22 C.J.S. Criminal Law, Section 63 (1961).
“ ‘High temper, hot blood, and passion, whether of an amorous nature, or arising from anger, hatred, jealousy, desire for revenge, or other emotions, will not excuse the commission of crime.’ 22 C.J.S. Criminal Law, Section 63. ‘Unusual or “weird” behavior alone cannot be equated with mental incompetency or insanity.’ Carey v. State, 361 So.2d 1176, 1179 (Ala.Cr.App.1978), cert. denied, 374 So.2d 332 (Ala.1979).”
Brackin v. State, 417 So.2d 602, 604 (Ala.Crim.App.1982).
Here, the circuit court’s instruction that unusual or weird behavior alone cannot be equated with mental incapacity or insanity is consistent with the law. Further, this instruction was not, under the facts of the case, misleading and would not have confused the jury. Accordingly, the circuit court committed no error in instructing the jury on unusual or weird behavior.
D.
Albarran next argues that the circuit court’s instructions on reasonable doubt lessened the State’s burden of proof. He specifically objects to the court’s use of the phrases: 1) in describing the evidence that could establish a reasonable doubt as “if you would be willing to accept such evidence of that type and character in matters of the highest importance to you personally”; and 2) in describing a reasonable doubt as a doubt for which a “rational reason can be given.” He cites Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990); and Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), in support of his assertion.
The circuit court gave the following instruction on reasonable doubt:
“The phrase reasonable doubt is somewhat self-explanatory. Efforts to define this term, however, do not always clarify the term. A reasonable doubt is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt. A reasonable doubt is not a mere guess or surmise. It does not mean a vague or arbitrary notion, nor is it — excuse me — or a doubt arising from bare imagination, a mere possibility, or from fanciful conjecture. A reasonable doubt cannot be based upon speculation.
“A reasonable doubt is a doubt based upon logic and reason. It is an actual doubt based upon the evidence, the lack of evidence, or a conflict in the evidence or a combination thereof. A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all of the evidence in the case. A reasonable doubt is a doubt for which a rational reason can be given.
“Now, finally, as it relates to the burden of proof I want to state it to you another way. If you would be willing to accept such evidence of that type and character in matters of the highest importance to you personally then you are so satisfied to the required degree of beyond a reasonable doubt.”
(R. 3676-78); (emphasis added.)
At the charge conference, defense counsel objected to the proposed charge on reasonable doubt and cited the United States Supreme Court’s opinion in Cage. The following then occurred:
“I’ll note that there are two Pattern Jury Instructions in the State of Alabama regarding burden of proof and I may just use one of those or I may *191 merge this one requested with one with part of what’s already written. Okay.
“[Defense counsel]: Very well.”
(R. 3436.) However, after the circuit court gave its instructions, defense counsel failed to object. Accordingly, this Court reviews this claim for plain error. See Rule 45A, Ala. R.App. P.
This Court has explained:
‘““The Due Process Clause of the Fourteenth Amendment ‘protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.’ In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970).... [T]he Court ‘made it clear that the proper inquiry is not whether the instruction “could have” been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.’ Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (quoting Estelle v. McGuire, 502 U.S. 62, 72-73, and n. 4, 112 S.Ct. 475, 482 and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow the conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, [513] U.S. [1023], 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala.Cr.App.1994).
“ ‘ “In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole. Victor v. Nebraska; Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of ‘reasonable doubt’ in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).” ’ ”
Lewis v. State, 24 So.3d 480, 518-19 (Ala.Crim.App.2006) (quoting Lee v. State, 898 So.2d 790, 841-42 (Ala.Crim.App.2001), quoting in turn Knotts v. State, 686 So.2d 431, 459 (Ala.Crim.App.1995)).
First, contrary to Albarran’s assertion on appeal, the circuit court’s instruction that “[i]f you would be willing to accept such evidence of that type and character in matters of the highest importance to you personally then you are so satisfied to the required degree of beyond a reasonable doubt” did not conflict with Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In Holland, the Supreme Court reviewed the following jury instruction describing reasonable doubt: “the kind of doubt ... which you folks in the more serious and important affairs of your own lives might be willing to act upon.” Id. The Court held that “this section of the charge should have been in terms of the kind of doubt that would make a person hesitate to act ... rather than the kind on which he would be willing to act. But we believe that the instruction as given was not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some.” Id. (emphasis added and citation omitted). Here, the circuit court’s instruction did not relate to the type of doubt that would cause a person to act. Instead, the circuit court explained that the type of evidence relied upon by the State must be of the type that the juror’s “would be willing to accept such evidence ... in matters of the highest importance *192 to you personally.” Because the circuit court was not referring to the type of doubt that would cause a person to act, Holland does not apply.
Second, the circuit court’s instruction that a reasonable doubt is a doubt that may arise from “the evidence, the lack of evidence, or a conflict in the evidence or a combination thereof’ and that it is one for which a “rational reason can be given,” did not lower the State’s burden of proof in violation of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In Cage, the Supreme Court held that the trial court’s instruction describing the doubt necessary for an acquittal as “substantial” and “grave” impermissibly suggested a higher degree of doubt than is required for an acquittal under the reasonable-doubt standard. Cage, 498 U.S. at 41. But see Victor v. Nebraska, 511 U.S. 1, 20, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (holding that an instruction that defines reasonable doubt as a substantial doubt is not unconstitutional when substantial refers to the existence of doubt as opposed to the magnitude of doubt). Here, the circuit court’s instruction that a reasonable doubt is a doubt that may arise from “the evidence, the lack of evidence, or a conflict in the evidence or a combination thereof,” but is one for which a “rational reason can be given,” did not suggest a higher degree of doubt than necessary for an acquittal. Instead, it merely conveyed the message that the State’s burden is beyond a reasonable doubt as opposed to beyond all doubt.
Finally, this Court has thoroughly reviewed the circuit court’s instructions on reasonable doubt and holds that there is no reasonable likelihood that the jury applied those instructions in a manner that would unconstitutionally lower the State’s burden of proof. “The jury could not have interpreted the trial court’s instruction to allow a finding of guilt based upon a degree of proof below that mandated by the United States Constitution.” Lewis v. State, 24 So.3d 480, 519 (Ala.Crim.App.2006). Because there is no reasonable likelihood that the jury applied the instructions in such a manner as to lessen the State’s burden of proof, this Court holds that there was no error, plain or otherwise, in the circuit court’s instructions.
E.
Albarran further argues that the circuit court erred in refusing to give a jury instruction on the “absence of flight.”
At the charge conference, defense counsel requested an instruction on the “absence of flight.” The circuit court noted that there was no authority to support the giving of that instruction and declined to include it in her charge to the jury. (R. 3441.) Albarran requested the following instruction:
“The absence of flight of a person or the failure of a person to attempt to evade the police immediately after the commission of the acts leading to an arrest, if the person had the opportunity to flee, is a matter to consider in light of all the circumstances, in deciding whether or not the defendant’s guilt has been proven beyond a reasonable doubt.”
(C.R. 295.)
Alabama has never specifically addressed whether a defendant is entitled to a jury instruction on “absence of flight.” However, this Court agrees with the reasoning of the Pennsylvania Superior Court:
“While a ‘flight’ instruction, whereby a jury may infer consciousness of guilt from an attempt to flee, is well established in this Commonwealth, see Pa. S.S.J.I. (Crim) 3.14; Commonwealth v. Bruce, 717 A.2d 1033 (Pa.Super.1998), appeal denied, 568 Pa. 643, 794 A.2d 359 *193 (1999), there is no authority for a corresponding but inverse ‘absence of flight’ instruction. Indeed, Appellant cites no authority for his notion. Other states that have addressed the issue, however, have uniformly rejected it. See e.g. Smith v. U.S., 837 A.2d 87, 100 (D.C. 2003), cert. denied, 541 U.S. 1081, 124 S.Ct. 2435, 158 L.Ed.2d 996 (2004); People v. Williams, 55 Cal.App.4th 648, 64 Cal.Rptr.2d 203, 205 (1997); State v. Pettway, 39 Conn.App. 63, 664 A.2d 1125, 1134 (1995), appeal denied, 235 Conn. 921, 665 A.2d 908 (1995); State v. Walton, 159 Ariz. 571, 769 P.2d 1017, 1030 (1989), affirmed, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); State v. Mayberry, 411 N.W.2d 677, 684 (Iowa 1987).
[[Image here]]
“[T]he ‘absence of flight’ instruction is unnecessary because, from the outset, an individual is presumed innocent until proven guilty and the jury is so instructed. Pa. S.S.J.I. (Crim) 7.01. Because the defendant is already ‘clothed with a presumption of innocence,’ [Commonwealth v.] Collins, [810 A.2d 698 (Pa.Super.2002) ] at 701 (citing Commonwealth v. Bishop, 472 Pa. 485, 372 A.2d 794, 796 (1977)), the jury need not be additionally charged on an inference of innocence where a suspect does not flee.”
Commonwealth v. Hanford, 937 A.2d 1094, 1097-98 (Pa.Super.2007). See State v. Jennings, 19 Conn.App. 265, 273, 562 A.2d 545, 549 (1989) (“The failure to flee, like voluntary surrender, ‘is not a theory of defense from which, as a matter of law, an inference of innocence may be drawn by the jury.’”).
Because the defendant is presumed innocent and the absence of flight “is not a theory of defense from which ... an inference of innocence may be drawn by the jury,” Jennings, 19 Conn.App. at 273, 562 A.2d at 549, the circuit court did not err in denying Albarran’s request for an “absence of flight” instruction.
XV.
Albarran next argues that the circuit court erred in denying his motion for a new trial after it was discovered that the jury foreperson, E.M., failed to accurately answer a question on her juror questionnaire.
The record shows that 200 prospective jurors were called for jury service for Al-barran’s trial. (C.R. 340.) After excusing jurors for health and undue-hardship reasons, 183 jurors remained. (R. 460.) These prospective jurors completed a 35-page juror questionnaire that contained 116 questions, many of which had numerous subparts. After reviewing the questionnaires, the number of prospective jurors was reduced to 114. Defense counsel moved to conduct individual voir dire of the prospective jurors on certain issues and stated: “Then we’ve got the ones like that have connections to family and stuff like victims of crime. We’re willing to give up practically all of the individual voir dire on that and just hone” in on their feelings toward the death penalty. (R. 517.) The jury-selection process consists of 7 volumes of the 32-volume record, and the majority of it focused on the juror’s views on capital punishment.
Here, Albarran moved for a new trial after learning that E.M. failed to disclose that she had been the victim of a crime. Albarran argued in his motion for a new trial that E.M. failed to disclose that her husband had assaulted her approximately 19 months before trial.
When reviewing a juror-misconduct claim, this Court applies the standard articulated by the Alabama Supreme *194 Court in Ex parte Dixon, 55 So.3d 1257 (Ala.2010):
“In [Ex parte] Dobyne, [805 So.2d 763 (Ala.2001),] this Court explained the standard for granting a new trial based on a juror’s failure to answer questions on voir dire truthfully:
“ ‘The proper standard for determining whether juror misconduct warrants a new trial, as set out by this Court’s precedent, is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant. See Ex parte Stewart, 659 So.2d 122 (Ala.1993).... The “might-have-been-prejudiced” standard, of course, casts a “lighter” burden on the defendant than the actual-prejudice standard. See Tomlin v. State, supra, 695 So.2d [157] 170 [ (Ala.Crim.App.1996)]....
“ ‘It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely.... However, not every failure to respond properly to questions propounded during voir dire “automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.” Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330, 335 (1970).... As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is “whether the defendant might have been prejudiced by a veniremember’s failure to make a proper response.” Ex parte Stewart, 659 So.2d at 124. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court’s discretion ....
“ ‘ “The determination of whether the complaining party was prejudiced by a juror’s failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: ‘temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror’s inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.’”
“ ‘Union Mortgage Co. v. Barlow, 595 So.2d [1335] at 1342-43 [ (Ala.1992)]....
“ ‘The form of prejudice that would entitle a party to relief for a juror’s nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror. Ex parte Ledbetter, 404 So.2d 731 (Ala.1981).... If the party establishes that the juror’s disclosure of the truth would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory challenge to strike the juror, then the party has made a prima facie showing of prejudice. Id. Such prejudice can be established by the obvious tendency of the true facts to bias the juror, as in Ledbetter, supra, or by direct testimony of trial counsel that the true facts would have prompted a challenge against the juror, as in State v. Freeman, 605 So.2d 1258 (Ala.Crim.App.1992).’
*195 “Dobyne, 805 So.2d at 771-73 (footnote omitted; emphasis added).”
Dixon, 55 So.3d at 1260-61.
“While we agree ... that a juror’s silence during voir dire could be a basis for granting a new trial, we must stress that the initial decision on this issue is within the trial court’s sound discretion. Hayes v. Boykin, 271 Ala. 588, 126 So.2d 91 (1960). Further, the trial court’s decision on this matter will not be disturbed on appeal unless the appellant establishes that the decision was arbitrarily entered into or was clearly erroneous. Id.”
Carter v. Henderson, 598 So.2d 1350, 1354 (Ala.1992). “[N]ot every failure of a venireman to respond correctly to a voir dire question will entitle the losing party to a new trial.” Wallace v. Campbell, 475 So.2d 521, 522 (Ala.1985).
“It is not ‘any failure of any prospective juror to respond properly to any question regardless of the excuse or circumstances [that] automatically entitles a party to new trial or reversal of the cause on appeal.’ Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330 (1970) (emphasis in original).”
Washington v. State, 539 So.2d 1089, 1095 (Ala.Crim.App.1988). “[T]he facts in each case must be considered individually and much will remain in the discretion of the trial judge.” Parish v. State, 480 So.2d 29, 32 (Ala.Crim.App.1985).
This Court has reviewed the challenged juror’s questionnaire.[7] For question number 35, E.M. responded that she had never been the victim of a crime. Question number 36 read: “Have you, or anyone close to you, ever been accused of, arrested or charged with a criminal offense?” E.M. initially checked the “no” box, but scratched that out and checked the “yes” box. In the explanation section she said that her husband had been accused of domestic assault, that he had been arrested, that there was no trial and no conviction, and that as a result of the arrest he was placed in anger management counseling. Below this section of the questionnaire, E.M. indicated that she believed that her husband had been treated fairly by the criminal justice system. E.M. also indicated in the first section of the questionnaire that she had been married over nine years. E.M.’s questionnaire shows that she answered most of the questions very candidly. There is no evidence indicating that E.M. deliberately concealed the domestic-assault charge.
At the hearing on the motion for a new trial, it was disclosed that E.M. had been the victim of the domestic assault for which her husband had been charged in municipal court. The charges had been nolle prossed. Apparently, the alleged assault occurred about 19 months before Al-barran’s trial. E.M. was not called to testify at the hearing, although it appears from the record that she was available to testify. Thus, this Court does not know if, or why, E.M. answered “no” to question 35 on her questionnaire. The prosecutor noted that “because of the juror’s answer to question number 36 it does necessarily imply that there was not some kind of purposeful attempt on that juror’s part to be deceitful in the preceding question, 35.” (R. 4321.) The prosecutor also argued that it was clear after examining E.M.’s questionnaire that E.M. had been the victim of her husband’s domestic-assault charge.
*196 When responding to defense counsel’s argument, the prosecutor stated:
“As noted in the State’s response, and probably the best place for us to start is that there remained, in addition to the anonymous juror, seven other jurors that remained on the panel that were of the 16 that answered affirmatively to the question, ‘Have you ever been the victim or a witness to a crime?’ Some of which were victims of violent crimes and those persons remained on the panel.
“For the same reasons espoused as to why the anonymous juror would be struck by defense, the State is — well, the State is of a mind to disagree that that would have been the defense’s tact because they did, in fact, leave seven other jurors who answered yes to question number 35 on the panel.
“In addition, the State would submit that the defense actually believed the anonymous juror to be perhaps a favorable juror to the Defendant. And the State goes through — I’m not sure I want to detail all of the answers to those questions, but, for instance, that particular juror noted that they might receive some negative feedback from their friends, from their clergy if they were to vote for death.
[[Image here]]
“[Question] 99(c) the juror admitted that relatives and close friends would criticize her if she voted for the death penalty for going against the church’s teachings, and that’s a quote.
“And, 104, the juror indicated that nothing about the charges or facts caused her any doubt as to her ability to be fair and impartial.
“Now, this all flies in the face of question number 36, where this particular juror really answered question number 35 as well, where she detailed that her husband had been charged and arrested for domestic violence.... And question number 36, you know, it at least would allow the defense to deduce that they needed to follow-up some more with some more questions during voir dire. The fact that they didn’t I think further supports the idea that the defense actually believed this particular juror to be a possible favorable juror for the verdict and sentence that the defense was trying to get from this — from this panel or from the inevitable panel.
[[Image here]]
“There’s no indication at all here that the — that this particular juror was willfully trying to deceive anybody. And that’s indicated by her answer to question number 36 where she — she clearly stated to all of us that this had happened in her life, at least, or to her husband.”
(R. 4306-11.)
“We are mindful of the heavy responsibility placed on the trial court to maintain the statutory right which parties have to a full and truthful disclosure by jurors on voir dire. However, we must also be aware of inadvertent concealment and failure to recollect on the part of prospective jurors.”
Freeman v. Hall, 286 Ala. 161, 167, 238 So.2d 330, 336 (1970). Given the unique circumstances presented in this case, this Court cannot say that the circuit court erred in denying Albarran relief on this claim. Here, the prospective juror’s inaccurate response regarding her prior victimization appears to have been inadvertent, and her responses to other questions should have led counsel, if they were concerned with the matter in question, to ask follow-up questions. Further, the record indicates that defense counsel were not concerned with prospective jurors’ prior victimizations because counsel did not strike a number of other potential jurors who had been victims of violent crimes. *197 Ex parte Dixon, 55 So.3d at 1260 (“The form of prejudice that would entitle a party to relief for a juror’s nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror.” (citations and quotations omitted)). Based on these facts, this Court cannot say that the circuit court abused its discretion in denying Albarran’s motion for a new trial.

Penalty-Phase Issues

XVI.
Albarran next argues that his sentence of death is unconstitutional under the United States Supreme Court’s decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), because he is mentally retarded. Albarran further contends that the circuit court abused its discretion in sentencing him to death because he established by a preponderance of the evidence that he is mentally retarded.
In Atkins, the United States Supreme Court held that the execution of mentally retarded capital offenders violates the Eighth Amendment’s prohibition of cruel and unusual punishment. Id. at 321. The Court, however, declined to establish a national standard for determining whether a capital offender is mentally retarded and, instead, left to the states “the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.” Id. at 317.
The Alabama Legislature has not yet established a method for determining whether a capital defendant is mentally retarded and, thus, ineligible for a sentence of death. “However, the Alabama Supreme Court, in Ex parte Perkins, 851 So.2d 453 (Ala.2002), adopted the most liberal definition of mental retardation as defined by those states that have legislation barring the execution of a mentally retarded individual.” Byrd v. State, 78 So.3d 445, 450 (Ala.Crim.App.2009) (citations and quotations omitted); see also Smith v. State, [Ms. 1060427, May 25, 2007] _ So.3d _, _ (Ala.2007) (“Until the legislature defines mental retardation for purposes of applying Atkins, this Court is obligated to continue to operate under the criteria set forth in Ex parte Perkins.”). Pursuant to Ex parte Perkins, “to be considered mentally retarded, [a capital defendant] must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior.” Ex parte Perkins, 851 So.2d at 456; see also Atkins, 536 U.S. at 321 n. 5; Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir.2009) (“According to literature in the field, significant or substantial deficits in adaptive behavior are defined as ‘concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.’ American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed.1994)”). Further, “these [two deficits] must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).” Ex parte Perkins, 851 So.2d at 456; Brownlee v. Haley, 306 F.3d 1043, 1073 (11th Cir.2002) (recognizing that mental retardation generally requires a showing of an IQ of 70 or below, significant limitations in adaptive skills, and the manifestation of these two deficits during the developmental years). “Therefore, in order for an offender to be considered mentally retarded in the Atkins context, the offender must currently exhibit subav-erage intellectual functioning, currently ex *198 hibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18.” Smith v. State, [Ms. 1060427, May 25, 2007] _ So.3d at _; see also Byrd v. State, 78 So.3d at 450 (same); cf. Ex parte Perkins, 851 So.2d at 456 (holding that Perkins was not mentally retarded because, among other reasons, Perkins’s full-score adult IQ was 76); Roper v. Simmons, 543 U.S. 551, 578-79, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (focusing on defendants’ culpability “when their crimes were committed”).
 “ ‘In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded.’ ” Byrd, 78 So.3d at 450 (quoting Smith, _ So.3d at _). “The question of [whether a capital defendant is mentally retarded] is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony of that issue.” Byrd, 78 So.3d at 450 (citations and quotations omitted). As the Alabama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, “ ‘which [have] the opportunity to personally observe the witnesses and assess their credibility.’ ” Smith v. State, _ So.3d at _ (quoting Smith v. State, [Ms. CR-97-1258, Sept. 29, 2006] _ So.3d _, (Ala.Crim.App.2006) (Shaw, J., dissenting) (opinion on return to third remand)).
“This court reviews the circuit court’s findings of fact for an abuse of discretion.” Byrd, 78 So.3d at 450 (citing Snowden v. State, 968 So.2d 1004, 1012 (Ala.Crim.App.2006)). “ ““ “A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.” ”” ” Byrd, 78 So.3d at 450-51 (quoting Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005), quoting in turn State v. Jude, 686 So.2d 528, 530 (Ala.Crim.App.1996), quoting in turn Dowdy v. Gilbert Eng’g Co., 372 So.2d 11, 12 (Ala.1979), quoting in turn Premium Serv. Corp. v. Sperry & Hutchinson, Co., 511 F.2d 225 (9th Cir.1975)).
Applying these principles, this Court concludes that the circuit court did not abuse its discretion when it determined that Albarran is not mentally retarded and, thus, is eligible for a sentence of death. At the sentencing hearing before the court, Albarran presented the testimony of Dr. Ricardo Weinstein, a forensic neuropsychologist. Dr. Weinstein testified that he conducted four different tests on Albarran and administered the Spanish version of the WAIS test to Al-barran and that Albarran’s full-scale IQ was 71. He further testified that based on the “Flynn effect,” Albarran’s IQ was around 68, and that given the margin of error, he believed that Albarran’s IQ was actually between 63 and 73. According to Dr. Weinstein, a person is mildly mentally retarded if that person has an IQ of between 55 and 75.[8] He said that he evaluated numerous records and spoke to some of Albarran’s family members. He said that Albarran was slow to learn, was socially withdrawn, had problems with learning skills, and, though he had completed the equivalent of the 9th grade, performed at a 4th-grade level. Dr. Weinstein further testified:
“[I]t’s my opinion to a high degree of scientific certainty that Mr. Albarran *199 fulfills the definition of mental retardation according to the DSM-IV [Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition] and the AAIDD [American Association on Intellectual and Developmental Disabilities]. In addition he suffers from significant brain disfunction [sic] with particular compromise to the frontal lobes. As a result his judgment and impulse control are severely affected.”
(R. 4388.)
The cross-examination of Dr. Weinstein was extensive. The State presented evidence indicating that Dr. Weinstein was personally opposed to capital punishment. Dr. Weinstein also admitted that Albarran was depressed when he took the IQ tests and that depression may affect some areas of IQ scores. He also testified that Albar-ran “has quite a bit of adaptive functioning.” (R. 4445.) Dr. Weinstein further admitted that he was aware of studies that were conducted and published that showed that subsequent to Atkins, defendants were faking their IQ scores.
The record indicates Albarran had been employed for most of his adult life. While in Mexico, he started his own farm. Further, the record indicates that Albarran was the manager of a restaurant. The State also presented the testimony of Roger Durr, an employee of Supreme Beverage Company, and Rodney Reece, a supervisor with Turner Beverage Company. Both testified that they made frequent deliveries to the El Jalisco restaurant, that Albarran would make the orders and pay and sign for the deliveries, and that in the time they were around Albarran, he never appeared slow or to have any mental problems.
The record further shows that Albarran had maintained long-term relationships. Albarran had been married for over 11 years and had a daughter, who was 11 years old at the time of the offense. Al-barran’s four sisters and one brother, who all testified at the sentencing hearing, portrayed Albarran as a loving father who worked hard to support his family. Three of his siblings read letters that Albarran had written to them. The letters reflected a close-knit family and showed Albarran as a considerate and loving brother. Albar-ran wrote to his brother to thank him for looking after his daughter. It is clear from their testimony that Albarran maintained a close relationship with his siblings.
Dr. Hooper testified at the guilt phase for the State. Dr. Hooper testified that Albarran was admitted to Taylor Hardin in November 2007 and that he remained there for 26 days. He testified that in the period Albarran was at Taylor Hardin, “[t]here was no evidence of any abnormality of thought, behavior, interactions or anything else,” (R. 3252), and Albarran showed “no evidence of any mental problem.” (R. 3265.) Dr. Hooper further testified that Albarran told him: “ T had hallucinations of the Devil before I pulled the trigger. The doctor who examined me for my attorney says that I will have a not guilty by reason of insanity.’ ” (R. 3264.)
Also, there were no records that showed any type of testing that was conducted on Albarran before he reached the age of 18. There were no school records, medical records, or any other documents that reflected that Albarran’s alleged mental condition manifested itself before the age of 18. See Nava Feldman, Annot., Application of Constitutional Rule of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that Execution of Mentally Retarded Person Constitutes ‘Cruel and Unusual Punishment’ in Violation of Eighth Amendment, 122 A.L.R.5th 145 (2004). First, this Court cannot, based on the record, say that the *200 circuit court abused its discretion in determining that Albarran failed to meet the definition of mental retardation adopted by the Alabama Supreme Court in Perkins based on Albarran’s IQ score. Dr. Wein-stein testified that Albarran’s full-scale IQ was 71. Although Dr. Weinstein also testified that, when adjusted for the “Flynn effect,” Albarran’s IQ was around 68, the circuit court could have reasonably rejected the “Flynn effect”[9] and determined that Albarran’s IQ was 71. Gray v. Epps, 616 F.3d 436, 446 n. 9 (5th Cir.2010) (quoting In re Mathis, 483 F.3d 395, 398 n. 1 (5th Cir.2007) (“[T]he Flynn Effect ‘has not been accepted in this Circuit as scientifically valid.’ ”)); Bowling v. Commonwealth, 163 S.W.3d 361, 375 (Ky.2005) (holding that “Atkins did not discuss margins of error or the ‘Flynn effect’ and held that the definition [of mental retardation] in KRS 532.130(2) ‘generally conform[ed]’ to the approved clinical definitions” so the court could not consider the Flynn effect); Thomas v. Allen, 607 F.3d 749, 758 (11th Cir.2010) (“[T]here is no uniform consensus regarding the application of the Flynn effect in determining a capital offender’s intellectual functioning, and there is no Alabama precedent specifically discounting a court’s application of the Flynn effect. ...”). Because the circuit court could have reasonably determined that Albar-ran’s IQ was 71, a score that places him outside the Alabama Supreme Court’s definition of mental retardation, this Court cannot say that the circuit court abused its discretion in denying Albarran’s Atkins motion.
Likewise, the circuit court could have, based on the record, found that Albarran failed to meet his burden to establish significant deficits in adaptive behavior. The circuit court was presented with evidence from individuals who dealt with Albarran on a regular basis and from a mental-health expert indicating that Albarran appeared normal. The circuit court had information indicating that Albarran was the manager of a restaurant and that he regularly conducted business for the restaurant. The circuit court was aware of articulate letters Albarran had written his family. Testimony was presented that Al-barran had owned his own farm while he was in Mexico. Albarran also successfully managed to illegally enter into the United States multiple times. Finally, the record establishes that Albarran maintained a close relationship with his family, that he was married, and that he had helped raise his 11-year-old daughter. Based on this evidence, this Court cannot say that the circuit court abused its discretion in determining that Albarran failed to meet his burden to establish significant deficiencies in adaptive behavior. See Byrd, 78 So.3d at 450-51 (holding that “[a] judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision”) (citations and quotations omitted).
XVII.
Albarran next argues that his death sentence violates the United States Supreme Court holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 *201 L.Ed.2d 556 (2002), and is due to be vacated.
The United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), held that any fact that increases the maximum punishment must be presented to a jury and proven beyond a reasonable doubt. This holding was extended to death-penalty cases in Ring v. Arizona.
In this case, the jury specifically found that the murder was especially heinous, atrocious, or cruel. (R. 4293.)[10] This finding, found by the jury to exist beyond a reasonable doubt, made Albarran eligible to receive the death penalty. Thus, the requirements of Ring were satisfied. See also Kimberly J. Winbush, Annot., Application of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) to State Death Penalty Proceedings, 110 A.L.R.5th 1 (2003).
Moreover, in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the Alabama Supreme Court stated:
“Contrary to [the appellant’s] argument, the weighing process is not a factual determination. In fact, the relative ‘weight’ of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, ‘While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not.’ Ford v. Strickland, 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which ‘the sen-tencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.’ Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See Harris v. Alabama, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (rejecting ‘the notion that “a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required” ’ (quoting Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)) and holding that ‘the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer’).
“Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (‘Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of *202 factors to determine whether death is the appropriate punishment.’); Zant v. Stephens, 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) (‘sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does’).”
859 So.2d at 1189 (footnote omitted).
Because the jury unanimously found that the murder was especially heinous, atrocious, or cruel, it found a fact necessary to make Albarran eligible for a sentence of death. (R. 4293.). Accordingly, Albarran’s death sentence complies with the United States Supreme Court’s holding in Ring, and Albarran is due no relief on this issue.
XVIII.
Albarran argues that evolving standards of decency have rendered Alabama’s method of execution — lethal injection — cruel and unusual punishment.
This issue has been addressed by both the Alabama Supreme Court and the United States Supreme Court. In Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520] 1538 [ (2008) ], and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
11 So.3d at 339. See also Vanpelt v. State, 74 So.3d 32, 90-91 (Ala.Crim.App.2009) (holding that lethal injection as a means of administering the death penalty is not unconstitutional).
Because this issue has been raised and rejected by the Alabama Supreme Court, the United States Supreme Court, and this Court, it is without merit. Therefore, Al-barran is not entitled to any relief on this issue.
XIX.
Albarran further argues that the circuit court erred in failing to prohibit the imposition of the death penalty in this case *203 because, he argues, Alabama’s capital-murder statute violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Specifically, Albarran argues “Alabama’s death penalty scheme violates the Equal Protection Clause because it fails to establish uniform statewide standards to guide prosecutors in deciding when they should seek the death penalty and does not provide any guidance as to what weight the trial court should give the jury’s advisory verdict.” (Albarran’s brief, at 129.)
To the extent that Albarran argues that the prosecutorial discretion in determining when to seek a death sentence renders Alabama’s death-penalty statute unconstitutional, this argument was rejected in Gregg v. Georgia, 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and is without merit. As the United States Supreme Court recognized in Gregg, pros-ecutorial discretion is inherent in criminal cases and does not render a death-penalty statute unconstitutional. Id.; see also People v. Hinton, 37 Cal.4th 839, 913, 38 Cal.Rptr.3d 149, 126 P.3d 981, 1035 (2006) (holding that “prosecutorial discretion to determine which defendants merit the death penalty does not render the scheme invalid”); State v. Harris, 106 Wash.2d 784, 794, 725 P.2d 975, 980 (1986) (holding that “[pjrosecutorial discretion regarding the decision whether to seek the death penalty presents no equal protection problem”). Accordingly, this argument is without merit.
To the extent that Albarran argues that Alabama’s sentencing scheme violates the Equal Protection Clause because it fails to set forth uniform standards as to how much weight a jury’s sentencing recommendation should be given by the trial judge, this Court rejected an identical argument in Lewis v. State, 24 So.3d 480, 536 (Ala.Crim.App.2006). In Lewis, this Court explained:
“Lewis also contends that our death-penalty scheme violates the Equal Protection Clause because, he says, it is arbitrary and disparate in that it fails to set forth uniform standards as to the weight a trial court must give a jury’s sentencing recommendation. As authority for this proposition, Lewis cites the decision in Bush v. Gore [, 531 U.S. 98, 121 S.Ct. 525 (2000) ]. We fail to see how this decision lends support for Lewis’s claim, given that the Supreme Court took care to state that its decision was ‘limited to the present circumstances,’ noting that ‘the problem of equal protection in election processes generally present many complexities.’ 531 U.S. at 109, 121 S.Ct. [at 532], Moreover, in Harris v. Alabama, 513 U.S. 504, 511-15, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), the United States Supreme Court rejected a claim that Alabama’s death penalty statute was unconstitutional because it did not specify what weight the trial court must afford a jury’s recommendation. Alabama courts have rejected similar claims that trial judges deprive defendants of equal protection under the law by employing different processes in determining what weight to give a jury’s recommendation as to sentencing. See, e.g., Smith v. State, 756 So.2d 892, 920 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.), cert. denied, 531 U.S. 830, 121 S.Ct. 82, 148 L.Ed.2d 44 (2000). Thus, no basis for reversal exists as to these claims.”
24 So.3d 480, 536 (Ala.Crim.App.2006). See also Mitchell v. State, 84 So.3d 968, 993-94 (Ala.Crim.App.2010) (same).
Based on this Court’s holding in Lewis, Albarran’s equal-protection argument is without merit. Therefore, Albarran is not entitled to any relief based on this issue.
*204 XX.
Albarran next argues that the circuit court’s instructions in the penalty phase were flawed. He makes several different arguments in support of this contention.
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999).
A.
First, Albarran asserts that the circuit court erred in instructing the jury that it could not consider any of his mitigating evidence. Specifically, he argues that the circuit court’s instructions concerning Defense Exhibit 64 were confusing and precluded the jury from considering mitigating evidence.
Defense exhibit 64 is a 69-minute recording. This recording was played to the jury during the sentencing hearing. The first part of the recording contains an interview with Albarran’s then 11-year-old daughter. She described her relationship with her father and said that she was not allowed to see him in prison because you had to be 12 years of age before you could visit. Next, the recording shows the rural area where Albarran grew up in Mexico. The narrator asks the jury to spare Albar-ran’s life. Next, a female resident of the community discusses how she had known Albarran since he was born and how she would feel if Albarran was executed. Next, Albarran’s mother testified about the poverty in the area. Albarran’s cousin and niece next asked the jury to spare Albarran’s life. The niece detailed the pain the family would suffer if Albarran was executed. Other residents of Albar-ran’s birthplace asked the jury to spare Albarran’s life and stated how they would feel if Albarran was executed.
The circuit court gave the following instruction in the penalty phase related to the recording:
“I want you to understand that the testimony of Mrs. Golden[, the victim’s mother, who testified concerning the impact of her son’s death on her life,] is what has been referenced here and what is referenced commonly in the field as victim impact evidence. Victim impact evidence is not a statutory aggravating circumstance and is not to be considered by you as such.
“You have also heard testimony from witnesses on the stand and witnesses through Defense exhibit 64, the 69 minute CD or DVD, if you will, that is commonly referenced in this field as execution impact evidence. That, ladies and gentlemen, is not evidence of a mitigating circumstance and is not to be considered by you as a mitigating circumstance.”
(R. 4229.) Defense counsel objected to the instruction and stated:
“And the Court’s pointing out that as it relates to the video, which I understand why the Court did that, but we think that also would be objectionable, confusing and misleading and against the—
“The Court: And I need to state for the record that the reason that was done was because the attorneys — referenced execution impact and the State objected. *205 These jurors don’t know specifically what’s being referenced regarding execution impact. They’ve heard death by lethal injection. They’ve heard death. You know, what execution means to them may be very different than what it means to all of us. So that was the reason I specifically referenced Mrs. Golden for victim impact and the Defendant’s 64 for execution impact.”
(R. 4254.)
Immediately after giving the challenged instruction the circuit court said that mitigating circumstances are “anything about the character and background of the defendant that supports a sentence of life without the possibility of parole as the appropriate sentence in this case.” (R. 4229-30.) The court had earlier instructed the jury that mitigating circumstances include “any aspect of the defendant’s character, childhood, maturity, mentality, education, life or background, any circumstances surrounding the offense and any other relevant mitigating evidence that you find is supported by the evidence in this case.” (R. 4226.) Clearly, the court instructed the jury that how the defendant’s family would be affected by Albar-ran’s execution was not a mitigating circumstance but that it could consider “any aspect of the defendant’s character, childhood, maturity, mentality, education, life or background, any circumstances surrounding the offense.”
In Woods v. State, 13 So.3d 1, 33-34 (Ala.Crim.App.2007), this Court joined the majority of courts and held that execution-impact evidence does not support a valid mitigating circumstance and is irrelevant in the penalty-phase of a capital-murder trial “because it does not relate to a defendant’s character or record or the circumstances of the crime.” See also Taylor v. State, 666 So.2d 36, 53 (Ala.Crim.App.1994) (holding that “the opinion of the friends or relatives of the defendant that the defendant should not be sentenced to death is not a relevant mitigating circumstance for the jury to consider at the penalty phase of a capital case”). As the Arizona Supreme Court aptly stated:
“In capital cases, ‘the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.’ Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). This requirement, however, does not limit ‘the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant’s character, prior record, or the circumstances of his offense.’ Id. at n. 12.
“We have previously held that execution impact evidence is not relevant to mitigation. [State v. Roque, 213 Ariz. 193, 222, 141 P.3d 368, 397 (2006) ]. In Roque, we upheld the trial court’s exclusion of sections of a letter from the defendant’s sister that ‘addressed the suffering of [defendant’s] family,’ concluding they were ‘altogether unrelated to defendant, to his character, or to the circumstance of the offense.’ Id. (citation and internal quotations omitted). Similarly, the trial court did not abuse its discretion here in excluding the execution impact evidence.”
State v. Chappell, 225 Ariz. 229, 236 P.3d 1176, 1185 (2010). See also United States v. Umana, [No. 3:08-cr-134, July 27, 2010] (W.D.N.C.2010) (unpublished opinion)(“Permitting a capital defendant to argue execution impact as a mitigating factor would run contrary to the principles underpinning Payne [v. Tennessee, 501 U.S. 808 (1991)]....”); United States v. Tay *206 lor, 583 F.Supp.2d 923, 944 (E.D.Tenn. 2008) (“[T]he testimony [of execution impact evidence] would be speculative. While testimony about the victim’s death is based on past events that witnesses can clearly and accurately testify about, the execution of a person in the future is a speculative event.”); Jackson v. Dretke, 450 F.3d 614, 618 (5th Cir.2006) (“[T]he Supreme Court has never included friend/family impact testimony among the categories of mitigating evidence that must be admitted.... ”); Commonwealth v. Harris, 572 Pa. 489, 524-25, 817 A.2d 1033, 1054, n. 16 (2002) (“Appellant’s ‘execution impact’ or ‘third party impact’ testimony also was not relevant under Pennsylvania’s capital sentencing statute.... It would be a strange proposition to allow such ‘execution impact’ evidence to be introduced as mitigation for the act of murder.”); State v. Stenson, 132 Wash.2d 668, 752, 940 P.2d 1239, 1281 (1997) (“[W]hile the impact on the victim’s family is arguably relevant to show the specific harm caused by the crime and the blameworthiness of the defendant — factors the United States Supreme Court has found relevant to the appropriate punishment — the impact on the defendant’s family is not comparably relevant to mitigate the specific harm of the crime or its blameworthiness.”).
Because “execution-impact [evidence] ... does not relate to a defendant’s character or record or the circumstances of the crime,” Woods, 13 So.3d at 34, such evidence does not support a valid mitigating circumstance and is irrelevant in the penalty-phase of a capital murder trial. Therefore, the circuit court correctly instructed the jury not to consider the evidence presented relating to how Albar-ran’s execution would affect third parties.
B.
Albarran next argues that the circuit court erred in failing to instruct the jury on all the specific nonstatutory mitigation circumstances he presented in the penalty phase.
Albarran objected to the circuit court’s failure to instruct the jury on the specific mitigating circumstances he had submitted, approximately 200 mitigating circumstances, and the circuit court stated: “I’m going to give childhood. I’m going to give that global instruction that you have requested, but those that were specifically delineated I’m not going [to give.]” (R. 4208.)
“This Court has held that the trial court does not have to instruct the jury from a list of specific nonstatutory mitigating circumstances provided by the defendant.” Brown v. State, 686 So.2d 385, 403 (Ala.Crim.App.1995). See also James v. State, 61 So.3d 357 (Ala.Crim.App.2010); McNabb v. State, 887 So.2d 929, 986 (Ala.Crim.App.2001).
In this case, the circuit court gave the following instruction:
“The law also includes a provision that would allow you to further consider as a mitigating circumstance not only the three that are specifically enumerated in this statute that I’m going to read to you, but shall also include any aspect of the Defendant’s character, childhood, maturity, mentality, education, life or background, any circumstances surrounding the offense and any other relevant mitigating evidence that you find is supported by the evidence in this case.
[[Image here]]
“Mitigating circumstances, again, relate to those mitigating circumstance I read to you. And in addition thereto, anything about the character and background of the defendant that supports a *207 sentence of life without the possibility of parole as the appropriate sentence in this case.”
(R. 4226-30.)[11]
Here, the circuit court’s instruction properly informed the jury that it could consider any aspect of Albarran’s character, his record, or the circumstances of the crime as mitigation. The circuit court was not required to list, classify, or name evidence of possible nonstatutory mitigating circumstance. See McNabb, 887 So.2d at 986. Therefore, the circuit court committed no error in failing to instruct the jury on each nonstatutory mitigating circumstance Albarran presented.
C.
Next, Albarran argues that the circuit court’s instructions on the application of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel were erroneous when compared to other capital offenses. Specifically, he argues that the court failed to give his requested jury instruction on the aggravating circumstance that “the mere apprehension of death immediately before the fatal wounds are inflicted does not amount to serious psychological torture.” (Albarran’s brief, at 110.) Albarran also argues that the circuit court’s instruction that “what constitutes appreciable lapse of time and what constitutes appreciable or prolonged suffering is for you ... to determine based upon the facts of this case,” left the jury “free to define the meaning of prolonged suffering” and unconstitutionally “broadened the definition of this aggra-vator.” (Albarran’s brief, at 109-11.)
The circuit court gave the following instruction on this aggravating circumstance:
“With respect to [especially heinous, atrocious, or cruel] the common meanings of the afore-referenced terms are routinely used by our courts. As such, quoting Webster’s Tenth Collegiate Dictionary, the words have been defined as follows. They also have common meanings, but the Webster’s Dictionary defines heinous as hatefully or shockingly evil.
“Atrocious as extremely wicked, brutal or cruel, barbaric, appalling, horrifying.
“Cruel: Disposed to inflict pain or suffering, devoid of human feelings, causing or conducive to injury, grief or pain.
“The term ‘especially’ is an adverb and means specially or in particular.
“Now, all murders to some extent are heinous, atrocious or cruel. The aggravating circumstance relied upon by the State, in accordance with the laws of this state, is that this particular murder was especially heinous, atrocious or cruel as compared to other capital cases.
[[Image here]]
“In order to prove beyond a reasonable doubt that this capital offense was especially heinous, atrocious or cruel as compared to other capital cases, I charge you that the standard for you to use is whether this capital murder was one of those conscienceless or pitiless homicides which was unnecessarily torturous to the victim.
*208 “The term ‘unnecessarily torturous’ may be either physical torture or psychological torture or both.
“One factor that is indicative of especially heinous, atrocious or cruel is the infliction on the victim of physical violence beyond that necessary or sufficient to cause death where the victim is conscious and aware that after the initial assault; i.e., that the victim was aware of his suffering.
“Another factor indicative that a murder is especially heinous, atrocious or cruel is the infliction of psychological torture.
“Psychological torture can be inflicted where the victim is in intense fear and is aware of but helpless to prevent impending death.
[[Image here]]
“Furthermore, as it relates to the definition just provided regarding unnecessary torture, that is for you to determine, if any. And if you determine that there was any I want you to understand that any unnecessary torture must have been present for an appreciable lapse of time sufficient to cause appreciable suffering or prolonged suffering.
“Now, what constitutes appreciable lapse of time and what constitutes appreciable suffering or prolonged suffering is for you, ladies and gentlemen, to determine based upon the facts of this case. That is for you to decide.”
(R. 4221-24.) After the court gave its jury instructions, Albarran objected to the court’s definition of “appreciable period of time” as applied to the aggravating circumstance that the offense was especially heinous, atrocious, or cruel. (R. 4245.)
In Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), this Court addressed the validity of a court’s instructions on this aggravating circumstance, and stated:
“The court’s instructions that this aggravating circumstance should apply to the conscienceless or pitiless crime which is unnecessarily [torturous] to the victim and one in which the brutality exceeds that which is normally present in any capital offense met the requirements of law. See Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Ex parte Kyzer, 399 So.2d 330 (Ala.1981); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).”
603 So.2d at 386.
The circuit court’s instructions were very detailed and limited the jury’s use of this aggravating circumstance to only those murders that were “conscienceless or pitiless homicides which are unnecessarily torturous to the victim.” The circuit court’s instructions complied with the Supreme Court’s holding in Ex parte Kyzer, 399 So.2d 330 (Ala.1981). When read in context, the circuit court’s instruction regarding what “constitutes appreciable lapse of time and what constitutes appreciable suffering or prolonged suffering is for you, [the jury], to determine based upon the facts of this case,” did not leave the jury free to define appreciable suffering. Instead, it correctly informed the jury that, as the finder of fact, it must determine, based on the facts of this case, whether Officer Golden suffered prolonged torture. Because the circuit court correctly instructed the jury regarding the especially heinous, atrocious, or cruel aggravating circumstance, this issue does not entitle Albarran to any relief.
D.
Albarran next argues that the circuit court’s instructions on the weighing process were erroneous because they *209 failed to instruct the jury that their verdict should be life imprisonment if the aggravating circumstances and the mitigating circumstances were equally balanced. He asserts that the circuit court’s instructions violate the Alabama Supreme Court’s holding in Ex parte Bryant, 951 So.2d 724 (Ala.2002).
Albarran made no objection to the court’s instruction on this issue; therefore, this Court reviews this claim for plain error. See Rule 45A, Ala. R.App. P.
In Bryant, the Alabama Supreme Court found plain error in the circuit court’s jury instructions on weighing the aggravating and the mitigating circumstances. The Supreme Court stated:
“In the case now before us, the jury instructions erroneously allow the conclusion that the death penalty is appropriate even if the aggravating circumstances do not outweigh the mitigating circumstances so long as the mitigating circumstances do not outweigh the aggravating circumstances. The trial judge in this case did not add the caveat which sufficed in [Ex parte ] Trawick, [698 So.2d 162 (Ala.1997) ], that the jury was to ‘recommend the death penalty only if [the jury] found that the aggravating circumstances outweighed the mitigating circumstances.’ Trawick, 698 So.2d at 173. Indeed, at the end of the instructions on this topic, the trial judge implicitly told the jury that it might recommend death even if the jury did not find an aggravating circumstance at all: ‘if you do not find that an alleged aggravating circumstance was proved, that does not automatically or necessarily mean that you should sentence Mr. Bryant to death....’ (R. 1103, quoted supra.) (Emphasis added).”
951 So.2d 724, 730 (Ala.2002). Later in Ex parte McNabb, 887 So.2d 998 (Ala.2004), the Supreme Court clarified its earlier holding in Bryant and stated:
“The charge in this case was not infected with the peculiar error present in Bryant, that is, the jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in Bryant that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error ‘seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,’ Ex parte Davis, 718 So.2d [1166,] 1173-74 [ (Ala.1998) ], so as to require a reversal of the sentence.”
887 So.2d at 1004.
Here, the circuit court specifically instructed the jury that it could not consider the weighing process until it found that an aggravating circumstance was present in the case. It further instructed the jury on three occasions that if the jury found aggravating circumstances in the case, it must also find that the aggravating circumstances outweigh the mitigating circumstances before the jury could recommend a sentence of death. Here, “the trial court did not invite the jury ... to recommend a sentence of death without finding any aggravating circumstance.” Ex parte Walker, 972 So.2d 737, 743 (Ala.2007).
“[Although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error ‘seriously affect[ed] the fairness, integrity or public reputa *210 tion of [the] judicial proceedings,’ Ex parte Davis, 718 So.2d [1166] at 1173-74 [ (Ala.1998) ], so as to require reversal of the sentence.”
McNabb, 887 So.2d at 1004. Accordingly, this Court holds that the circuit court’s failure to instruct the jury regarding what to do if the mitigating circumstances and aggravating circumstances were equal did not amount to plain error. Rule 45A, Ala.R.App. P.
E.
Albarran next argues that the circuit court erred in instructing the jury that its verdict was a recommendation. Specifically, Albarran argues that informing the jury that its penalty-phase verdict was a recommendation “misle[ ]d the jury as to its role in the sentencing process in a way that allow[ed] the jury to feel less responsible than it should for the sentencing decision” in violation of Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). (Albarran’s brief, at 115.)
First, the circuit court did not misinform the jury that its penalty phase verdict is a recommendation. Under § 13A-5-46, Ala. Code 1975, the jury’s role in the penalty phase of a capital case is to render an advisory verdict recommending a sentence to the circuit judge. It is the circuit judge who ultimately decides the capital defendant’s sentence, and, “[w]hile the jury’s recommendation concerning sentencing shall be given consideration, it is not binding upon the courts.” § 13A-5-47, Ala. Code 1975. Accordingly, the circuit court did not misinform the jury regarding its role in the penalty phase.
Further, Alabama courts have repeatedly held that “the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was ‘advisory' and a ‘recommendation’ and that the trial court would make the final decision as to sentence does not violate Caldwell v. Mississippi.” Kuenzel v. State, 577 So.2d 474, 502 (Ala.Crim.App.1990) (quoting Martin v. State, 548 So.2d 488, 494 (Ala.Crim.App.1988)). See also Ex parte Hays, 518 So.2d 768, 777 (Ala.1986); White v. State, 587 So.2d 1236 (Ala.Crim.App.1991); Williams v. State, 601 So.2d 1062, 1082 (Ala.Crim.App.1991); Deardorff v. State, 6 So.3d 1205, 1233 (Ala.Crim.App.2004); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007). Such comments, without more, do not minimize the jury’s role and responsibility in sentencing and do not violate the United States Supreme Court’s holding in Caldwell. Therefore, the circuit court did not err by informing the jury that its penalty-phase verdict was a recommendation.
F.
Albarran further argues that the circuit court erred in failing to give the jury a mercy instruction.
After the circuit court gave its jury instructions, Albarran did not object to the court’s failure to give an instruction on mercy. Accordingly, this Court reviews this claim for plain error only. See Rule 45A, Ala. R.App. P.
“Alabama courts have held that capital defendants are not entitled to jury instructions on mercy and residual doubt.” Burgess v. State, 723 So.2d 742, 769 (Ala.Crim.App.1997). “[A] juror may not arbitrarily consider mercy when deciding whether a defendant should be sentenced to death or life imprisonment without the possibility of parole.” Blackmon v. State, 7 So.3d 397, 438 (Ala.Crim.App.2005). Because Albarran was not entitled to a jury instruction on mercy, McMillan v. State, *211 [Ms. CR-08-1954, Nov. 5, 2010] _ So.3d _, _ (Ala.Crim.App.2010), no error, much less plain error, resulted from the circuit court’s failure to give such an instruction.
G.
Albarran next argues that the circuit court erroneously charged the jury that it had to unanimously agree on the existence of a mitigating circumstance. This issue is being raised for the first time on appeal; therefore, this Court reviews it for plain error. See Rule 45A, Ala. R.App. P.
The circuit court gave the following instruction on aggravating circumstances: “In order for you to find the existence of an aggravating circumstance you must unanimously; that is, all 12 of your number must agree, that the aggravating circumstance being considered has been proven beyond a reasonable doubt.” (R. 4216.) When instructing the jury on mitigating circumstances, the circuit court stated: “While all evidence submitted as mitigation is required to be considered by you, whether the evidence is actually found to be mitigating, is for you to decide. If you are personally persuaded that a mitigating factor exists then you may consider that factor while weighing the evidence.” (R. 4228.)
In Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999), this Court addressed a similar issue and stated:
“Freeman also contends that the trial court erred by failing to instruct the jury that its findings as to mitigating circumstances did not have to be unanimous. In failing to so instruct the jury, he says, the trial court implied that the jurors had to unanimously agree before they could find the existence .of a mitigating circumstance. Freeman did not object at trial to the trial court’s instructions to the jury concerning mitigating circumstances; therefore, we will review this claim under the plain error rule. Rule [45A,] Ala. R.App. P. We have reviewed the trial court’s instructions to the jury; we find nothing in the instructions that would have suggested to the jurors, or given them the impression, that their findings concerning the existence of mitigating circumstances had to be unanimous. See Coral v. State, 628 So.2d 954, 985 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997).”
776 So.2d at 195.
“The Alabama Supreme Court addressed this identical issue in Ex parte Martin, 548 So.2d 496, 499 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), and held that under the instructions given in Martin, ‘the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor.’ For cases following Martin, see Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). The instructions given in Martin are substantially the same as those given in the instant case. After reviewing the instructions in the present case in their entirety, we conclude that there is no reasonable likelihood or probability that the jurors believed or could have reasonably believed that they were required to agree unanimously on the exis- *212 tenee of any particular mitigating circumstance. The instructions were not only legally correct, but were clear and understandable.”
Williams v. State, 710 So.2d 1276, 1307 (Ala.Crim.App.1996).
Here, nothing in the instructions implied that the jury’s findings on mitigation had to be unanimous. In fact, the court instructed the jury that “[i]f you are personally persuaded that a mitigating factor exists then you may consider that factor while weighing the evidence.” Accordingly, this Court holds that no error, much less plain error, resulted from the court’s instructions. See Williams, 710 So.2d at 1307.
XXI.
Albarran further argues that the cumulative effect of the errors requires that he be granted a new trial.
The Alabama Supreme Court explained: “ ‘[Wjhile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, [Ala. R.App. P.,] if the accumulated errors have “probably injuriously affected substantial rights of the parties,” then the cumulative effect of the errors may require reversal.’ Ex parte Woods, 789 So.2d 941, 942 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.).”
Brownfield v. State, 44 So.3d 1, 33 (Ala.Crim.App.2007).
Applying the standard set forth in Woods, this Court has reviewed the alleged errors Albarran has raised on appeal and has scrupulously searched the record for errors not raised on appeal. Rule 45A, Ala. R.App. P. After a thorough review of the record, this Court is convinced that individually or cumulatively, no error or errors entitle Albarran to relief.

Sentencing Order

XXII.
Albarran argues that the circuit court erred in concluding that some of the proffered mitigation evidence was not mitigating.
As stated above, Albarran submitted a proposed 27-page memorandum in support of sentencing him to life without the possibility of parole rather than death. In the memorandum Albarran asserted that he had presented evidence in support of 200 nonstatutory mitigating circumstances. Those circumstances ranged from “[t]he defendant committed the offense under the duress of being shot at” to “[t]he defendant has demonstrated the capacity of accepting responsibility.” (C.R. 371-98.)
In its sentencing order the circuit court specifically addressed each of the 200 proffered circumstances and stated:
“In conclusion, regarding the additional mitigating circumstances alleged by the defendant addressed by this Court above, this Court finds it necessary to state that while all of the proffered mitigating circumstances were considered by this Court, the Court found many of them to be redundant, convoluted, and/or speculative. This Court did, however, consider all of the afore-refer-enced proffered mitigating circumstances and reflected upon the record in its entirety giving particular attention to all aspects of the defendant’s character and record.”
(C.R. 463.)
The United States Supreme Court’s decision in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), requires that a circuit court consider all evidence offered in mitigation when determining a capital defendant’s sentence. However,
*213 “ ‘[M]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact. Mikenas [v. State, 407 So.2d 892, 893 (Fla.1981) ]; Smith [v. State, 407 So.2d 894 (Fla.1981) ].’ Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).”
Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999). “ ‘Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance.’ ” Simmons v. State, 797 So.2d 1134, 1182 (Ala.Crim.App.1999), quoting Wilson v. State, 777 So.2d 856, 893 (Ala.Crim.App.1999). “ ‘While Lockett [v. Ohio, 438 U.S. 586 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’” Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989).
The circuit court’s order clearly shows that it considered each of the proffered mitigating circumstances and that it complied with Lockett. Therefore, this issue does not entitle Albarran to any relief.
XXIII.
Albarran also argues that the circuit court erred in finding that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. Specifically, he argues that there was no medical evidence that Officer Golden “experienced anything more than ‘momentary fear or anxiety of impending death;’ ” therefore, his murder was not especially heinous, atrocious, or cruel. (Albarran’s brief, at 119.)
In regard to this aggravating circumstance, the circuit court stated the following in its order:
“The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, and was proven beyond a reasonable doubt as evidenced by the following:
“(a) Officer Golden was rendered defenseless after his weapon jammed and rendered disabled after the shot that landed him on the pavement.
“(b) Once defenseless and disabled, Officer Golden was subjected to the infliction of great fear, extreme pain and mental anguish prior to the infliction of the final shot, which ultimately caused his death.
“(c) The testimony of Chad Steele revealed that Officer Golden ‘sounded like a dog when it was getting wounded’ as he begged the defendant to spare his life.
“(d) The testimony of William Thomas, who re-enacted the shooting with Deputy District Attorney and demonstrated the position of Officer Golden as the final shots were fired, evidenced this defendant’s extreme indifference to human life.
“(e) While this Court recognizes that any murder of a defenseless victim is to some extent heinous, atrocious or cruel, this Court finds that the degree of atrocity, cruelty and heinousness in this case exceeds that common to other capital offenses.”
(C.R. 433-34.)
The Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330 (Ala.1981), described the aggravating circumstance of especially heinous, atrocious, or cruel to include “ ‘those conscienceless or pitiless *214 homicides which are unnecessarily torturous to the victim.’ ” 399 So.2d at 334 (quoting in part Lindsey v. Thigpen, 875 F.2d 1509, 1514 (11th Cir.1989)).
In considering the application of this aggravating circumstance this Court assessed the following factors: (1) whether the infliction of the physical violence was beyond that necessary to cause death; (2) whether the victim experienced “appreciable suffering after a swift assault that ultimately resulted in death”; and (3) whether the victim suffered psychological torture. See Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999).
Here, Officer Golden attempted to ward off the assault, but his gun jammed. He was shot and fell to the ground begging for his life. Albarran walked up to him and shot him twice in the head. Albarran had two different guns. Eyewitness testimony showed that Officer Golden was conscious until the last shots entered his head. “This Court has held that ‘[w]hen a defendant deliberately shoots a victim in the head in a calculated fashion, after the victim has already been rendered helpless by [prior] gunshots ..., such “extremely wicked or shockingly evil” action may be characterized as especially heinous, atrocious, or cruel.’ ” Mitchell v. State, 84 So.3d 968, 986 (Ala.Crim.App.2010) (quoting Hardy v. State, 804 So.2d 247, 288 (Ala.Crim.App.1999)). Also, “[plsychological torture can be inflicted by leaving the victim in his last moments aware of, but helpless to prevent, impending death.” Norris, 793 So.2d at 859-60. Accordingly, this Court holds that the murder in this case was especially heinous, atrocious, or cruel as compared to other capital murders and that this aggravating circumstance was correctly applied in this case.
XXIV.
Finally, according to § 13A-5-53, AIa.Code 1975, this Court must address the propriety of Albarran’s conviction and sentence of death.
Albarran was convicted of murdering Officer Golden while he was on duty, a violation of § 13A-5-40(a)(5), Ala.Code 1975.
A review of the record shows that Albar-ran’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala. Code 1975.
The circuit court determined that the aggravating circumstance outweighed the mitigating circumstances. The court found, as did the jury, that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. See § 13A-5^9(8), Ala.Code 1975. (C.R. 433.) As statutory mitigating circumstances, the court found that Albarran had no significant history of prior criminal activity, § 13A-5-47(d)(l), Ala.Code 1975. The circuit court then individually set out each of the 200 nonstatutory mitigating circumstances that Albarran had argued to the court and found the following nonstatutory mitigating circumstances to exist: (1) Al-barran was gainfully employed at the time of the offense; (2) Albarran is a calm, tranquil person who never caused any problems with anyone while he was in Mexico; (3) Albarran lived over 30 years without any significant prior criminal history; (4) Albarran worked hard to support his wife and child; (5) Albarran showed the potential for positive and sustained human relationships; (6) Albarran has no criminal history in Mexico; (7) Albarran enjoyed a good reputation in the community where he was raised; (8) Albarran showed great love and affection for his daughter; (9) Albarran was not a disciplinary problem in school; (10) Albarran *215 showed a capacity to form loving relationships; (11) Albarran helped support his parents financially; (12) Albarran had been a good and respectful son; (13) Al-barran attempted to manage a restaurant; (14) Albarran showed the capacity to realize his mistakes; (15) Albarran continues to express love and compassion for his family; (16) the offense was committed while Albarran was under the influence of alcohol and cocaine; (17) Albarran had a history of drug and alcohol abuse; (18) Albarran’s conduct was affected by the use of drugs and alcohol; (19) Albarran consumed alcohol and cocaine on the day of the murder; (20) Albarran experienced a difficult childhood; (21) Albarran was the victim of an abusive, unstable, and deprived childhood; (22) Albarran was raised in poverty and third-world conditions; (23) Albarran witnessed a murder when he was very young; (24) Albarran was subjected to a nightmarish home environment as a child; (25) Albarran’s childhood was less than ideal; (26) Albarran encouraged family members to avoid his mistakes; (27) Albarran had love and affection from his family; (28) Albarran maintained contact with and had concern for his family; (29) Albarran’s mental health; (30) Albarran has a history of low self-esteem; (31) Al-barran’s mood disorder was worsened by drug and alcohol use; (32) Albarran’s family has a long history of mental illness; (33) Albarran is not antisocial; (34) Albarran has a psychopathic personality; (35) Albar-ran has a history of social-interaction problems; (36) Albarran did not flee from the scene of the crime; (37) the court considered the cumulative impact of the mitigating evidence; (38) Albarran’s IQ score was “just outside the range of mental retardation”; and (39) Albarran is remorseful. In conclusion, the court stated:
“[Wjhile all of the proffered mitigating circumstances were considered by this Court, the Court found many of them to be redundant, convoluted, and/or speculative. This Court did, however, consider all of the afore-referenced proffered mitigating circumstances and reflected upon the record in its entirety giving particular attention to all aspects of the defendant’s character and record.”
(C.R. 463.) After weighing the aggravating circumstance and the mitigating circumstances, the circuit court determined that death was the appropriate sentence in this case.
According to § 13A-5-53(b)(2), Ala.Code 1975, this Court must independently weigh the aggravating and the mitigating circumstances. This Court is convinced, as was the circuit court, that death is the appropriate sentence for Albarran’s cold and deliberate actions in murdering Officer Golden.
Further, Albarran’s sentence is not disproportionate or excessive as compared to sentences in other capital-murder cases. See § 13A-5-53(b)(3), Ala.Code 1975. See Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005) (upheld death sentence when sole aggravating circumstance was that the murder was especially heinous, atrocious, or cruel); Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988).
Rule 45A, Ala. R.App. P., also requires this Court to search the record for any error that may have adversely affected Albarran’s substantial rights. This Court has done so and finds no error that has affected Albarran’s substantial rights.
For the foregoing reasons, Albarran’s capital-murder conviction and his sentence of death are affirmed.
APPLICATION FOR REHEARING OVERRULED; OPINION OF FEBRU *216 ARY 25, 2011, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
WELCH, P.J., and KELLUM, BURKE, and JOINER, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. To protect the anonymity of the jurors, this Court will use their initials.

. Question number 58 on the juror questionnaire asked:
"(a): Do you believe that the protections of the Constitution should extend to both citizens and non-citizens?
"(b): Do you believe that the protections of the Constitution should extend to both citizens as well as undocumented workers (so-called illegal immigrants)?
[[Image here]]
"(d): Mr. Albarran is Hispanic and a citizen of the Country of Mexico. Is there anything about his ethnicity or national origin that would cause you to hesitate in extending the rights and protections the law allows?”

. Albarran also argues in this section of his brief that the prosecutor erred in referring to his status in arguments. However, evidence of his immigration status was admitted at trial and was the proper subject for comment by the prosecutor. "It is axiomatic that a prosecutor may legitimately argue facts in evidence...." Harris v. State, 2 So.3d 880, 920 (Ala.Crim.App.2007).

. The jurors were allowed to visit the crime scene. (R. 2354.) The jurors were also shown photographs of the crime scene.

. "While most pattern jury instructions may be properly used in the majority of criminal and civil cases, there may be some instances when using those pattern charges would be misleading or erroneous.” Ex parte Wood, 715 So.2d 819, 824 (Ala.1998).

. This questionnaire was sealed by the circuit court and forwarded to this Court at our request.

. Alabama has not adopted Dr. Weinstein’s definition. See Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002).

. "The so-called 'Flynn effect’ is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population. Those who follow the Flynn effect adjust for it by deducting from the IQ score a specified amount for each year since the test was normalized.” Wiley v. Epps, 625 F.3d 199, 203 n. 1 (5th Cir.2010) (citing In re Salazar, 443 F.3d 430, 433 n. 1 (5th Cir.2006)).

. The foreman read this finding when the jury returned its verdict. The jury was instructed on two aggravating circumstances— § 13A-5-49(5), Ala.Code 1975, "The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody,” and § 13A-5-49(8), Ala.Code 1975, "The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.” The jury found the existence of one aggravating circumstance.

. As part of this issue, Albarran also argues that it was error for the court to not allow him to argue "rehabilitation.” Defense counsel stated: "I’m happy to do redemption instead of rehabilitation if that would — but I don’t think it's right.” (R. 3880.) Defense counsel acquiesced to using the term "redemption” instead of "rehabilitation." Because Albarran was allowed to present this theory of mitigation, although using a different word, there is no plain error. See Rule 45A, Ala. R.App. P.